AMY JANE LONGO, Cal. Bar. No. 198304
Email: longoa@sec.gov
ROBERTO A. TERCERO, Cal. Bar. No. 143760
Email: terceror@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| JASON MCDIARMID, KENNETH GEORGE CEDRIC TELFORD and STOP SLEEP GO INC., fka INTERACTIVE MULTI-MEDIA AUCTION CORP. | |
| Defendants, | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.    The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.      Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a). because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

## SUMMARY

4.      This matter concerns a $3.1 million market manipulation scheme by two undisclosed control persons and promoters—Jason McDiarmid and Kenneth George Cedric Telford—to create Interactive Multi-Media Auction Corp. ("IMMA"), take it public, and profit from a pump and dump of its stock.  McDiarmid and Telford incorporated IMMA and took it public through a 2013 Form S-1 registration statement, registering a public offering of IMMA's common stock by selling shareholders, including two of McDiarmid's and Telford's nominees.  IMMA's Form S-1 and its amendments falsely claimed that IMMA's chief executive officer, McDiarmid's friend who had no corporate experience, ran the company, even though in reality, McDiarmid and Telford ran it.  The S-1s also included misrepresentations that certain selling stockholders purchased their shares in private placements, which were in fact sham transactions.

5.      Once the Form S-1 went effective, McDiarmid repeated these false and misleading statements, along with others, to a market maker for IMMA's stock, who included them in its successful application to obtain clearance from FINRA to quote IMMA's stock on the OTC Link, an electronic inter-dealer quotation system that displays quotes from broker-dealers for many over-the-counter securities, and thereby enable their public trading.

6.      To sell the shares that they controlled, McDiarmid and Telford opened

2

brokerage accounts in the names of nominees and, when they deposited IMMA shares, misrepresented how much stock they owned, how they obtained it, and their relationship to the nominees. Before and during the stock promotion, McDiarmid and Telford also prepared IMMA's periodic filings to the SEC, which largely contained the same false and misleading statements as its Form S-1s.

7.     Lastly, from October 2014 to May 2015, McDiarmid and Telford organized and implemented a promotional campaign, including email blasts and a boiler room to target senior citizens. As a result of their campaign, IMMA's stock price increased significantly, from $0.93 per share on September 30, 2014 to $1.62 per share on May 1, 2015, during which time McDiarmid and Telford dumped their shares through their nominees for net proceeds of about $3.1 million.

8.     By this conduct, McDiarmid and Telford violated the registration provisions of Section 5(a) and 5(c) and the antifraud provisions of Section 17(a) of the Securities Act, 15 U.S.C. §§ 77(e)(a), 77(e)(c), 77q(a), and the antifraud provisions of Section 10(b) and control person provisions of Section 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5(a)-(c) thereunder, 17 C.F.R. § 240.10b-5(a)-(c). IMMA by this conduct violated the antifraud provisions of Section 17(a)(1) and (a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(1) and (3), and the antifraud provisions of Section 10(b), 15 U.S.C. §§ 78j(b), and Rule 10b-5(a)-(c) thereunder, 17 C.F.R. § 240.10b-5(a)-(c).

9.     The SEC seeks permanent injunctions, disgorgement of McDiarmid's and Telford's ill-gotten gains, prejudgment interest, civil penalties, and penny stock and officer and director bars against McDiarmid and Telford.

## **THE DEFENDANTS**

10.     **Jason McDiarmid** ("McDiarmid") is a Canadian citizen living in British Columbia, Hong Kong, and the Philippines. He purports to be a financial consultant who helps companies go public. He founded the nominee entity Pompeii Finance Corp. ("Pompeii"), which he ran with Telford, and is an employee of the nominee

entity Ecogenics Limited ("Ecogenics").

11.   **Kenneth George Cedric Telford** ("Telford") is a Canadian citizen living in the Philippines.  He is the principal of nominee entity Denon Capital Strategies Ltd. ("Denon"), and with McDiarmid, he ran the nominee entity Pompeii, of which he was the sole director.

12.   **Stop Sleep Go Inc., fka Interactive Multi-Media Auction Corp.** is a British Virgin Islands corporation with its principal place of business during the relevant period in Hong Kong, and now in London.  IMMA claimed that it planned to become an auctioneer and dealer of fine art, fashion, and design.  Its stock was quoted on the OTC Link under the ticker symbol "IMMA."  On October 28, 2016, IMMA entered into a reverse merger with Stop Sleep Go Inc.  Its stock is now quoted on the OTC Link under the ticker symbol "SSGOF."

## THE DEFENDANTS' NOMINEE ENTITIES

13.   **Denon Capital Strategies Ltd.** is a British Virgin Islands corporation with its principal place of business in Hong Kong.  It is one of Telford's nominees, which he used maintain and increase IMMA's stock price.  During the scheme, Denon purchased about $400,000 worth of IMMA stock.

14.   **Ecogenics Limited** is a Hong Kong entity controlled by McDiarmid and Telford with its principal place of business in the Philippines.  During the scheme, it sold about $2.3 million worth of IMMA stock.

15.   **Pompeii Finance Corp.** is a British Virgin Islands corporation with its principal place of business in Hong Kong.  McDiarmid founded and ran Pompeii with Telford, who was its sole director.  During the scheme, Pompeii sold about $1.2 million worth of IMMA stock.

## THE ALLEGATIONS

**A.   McDiarmid and Telford Create IMMA and Install its Puppet CEO**

16.   In 2008, McDiarmid approached a high school friend (the "straw CEO"), to ask if she wanted to revive a company she previously owned, ArtShowcase, and

4

take it public.  Before it had gone out of business, ArtShowcase had served as a television-based art auction house.

17.     McDiarmid and the straw CEO continued to discuss McDiarmid's proposal sporadically until 2012.  McDiarmid told the straw CEO that if they proceeded, he would take care of all of the business matters.  The straw CEO told McDiarmid that she knew nothing about running a public company or taking a company public.

18.     On July 13, 2012, McDiarmid incorporated IMMA in the British Virgin Islands and began drafting IMMA's business plan.

19.     In or about October 2012, McDiarmid and Telford created a fictitious loan agreement whereby a Hong Kong entity, Morpheus Financial Corporation ("Morpheus"), purported to provide IMMA a $15,000 (CAD) credit line.

20.     In or about November 2012, McDiarmid and Telford created two internal IMMA memoranda, supposedly from the straw CEO, memorializing her payment of $4,225 (USD) in return for 4.25 million IMMA "founders' shares" and her receipt of $2,000 (USD) from Morpheus for 2 million IMMA shares.

21.     The straw CEO never paid for or received any shares, and never saw the loan agreement or either internal memorandum.

22.     McDiarmid and Telford backdated the loan agreement and memoranda to July 2012, though they had actually created them in October and November 2012.

**B.     The Phony Private Placements and Consulting Agreements**

23.     From September to October 2012, McDiarmid conducted two sham private placement offerings to twelve Filipino investors, supposedly selling 250,000 shares of IMMA's common stock for a total of $15,000 (CAD).  In fact, no stock certificates were ever issued to the sham private placement investors.

24.     For both offerings, McDiarmid directed a Canadian law firm to create a subscription agreement.  The subscription agreements each bore the straw CEO's signature; however, the straw CEO did not know about or authorize the offerings, nor

authorize anyone to sign the agreements on her behalf.  No stock certificates were ever issued to the investors.

25.     From September through October 2012, McDiarmid and Telford prepared six bogus consulting agreements for IMMA.

26.     Four of the agreements—including one with nominee Pompeii—gave the appearance that IMMA was deploying agents to locate art for its anticipated web auctions.  The consultants' compensation ranged from 750,000 to 1,125,000 shares of IMMA stock.  Pompeii purportedly received 825,000 shares.

27.     In the fifth agreement, nominee Ecogenics agreed to provide financial and management consulting services in return for 275,000 IMMA shares.

28.     In the sixth agreement, the sister of the straw CEO (the "straw CEO's sister") agreed to provide business development and management services in return for one million IMMA shares.

29.     The consulting agreements were a façade.  Though the agreements purported to bear the straw CEO's signature, she had no knowledge of the agreements and did not authorize anyone to sign or negotiate them.

30.     Though McDiarmid directed the straw CEO's sister to sign a standalone signature page for her consulting agreement, she never agreed to provide consulting services in exchange for IMMA stock.

31.     Upon notice of the SEC's subpoena for the straw CEO's sister's testimony in its investigation, McDiarmid sent the straw CEO's sister a copy of the complete consulting agreement and a suggested "script" for her SEC testimony, which included false information about her relationship with Telford.

**C.     Misrepresentations in IMMA's Registration Statements**

32.     McDiarmid and Telford next took IMMA public through a registration statement on Form S-1 filed with the SEC, offering common stock of the sham private placement investors and of certain of the "consultants," including 500,000 shares each from the straw CEO's sister and Pompeii.

33.     IMMA filed its initial registration statement on January 7, 2013, and six amendments from April 16, 2013 to October 10, 2013.  The Form S-1 was declared effective on October 18, 2013.

34.     McDiarmid and Telford controlled the entire registration statement process.  Though the straw CEO's name appeared on the Form S-1s, her sole involvement was signing the management representation and engagement letters at McDiarmid's instruction, and having one conversation with IMMA's outside auditor.  The straw CEO never saw, signed or authorized anyone to sign or file the Form S-1s.

35.     McDiarmid hired securities counsel in Canada and the outside auditor, in addition to an "Edgarizing agent" that submitted the Form S-1s to the SEC at McDiarmid's or Telford's direction.

36.     McDiarmid prepared the initial Form S-1 drafts.

37.     Telford prepared IMMA's financial statements, in which he incorporated the fabricated transactions that he and McDiarmid created to make IMMA look like a *bona fide* company:  the Morpheus loan; the straw CEO's purported stock purchase; the private placements; and the sham consulting agreements.

38.     McDiarmid and Telford collected comments on the S-1 drafts.   When the drafts were final, McDiarmid authorized the Edgarizing agent to file the S-1 with the SEC.

39.     McDiarmid and Telford provided the auditor with the documents for the fabricated transactions.  McDiarmid also sent the auditor a sample subscription agreement for each of the two sham private offerings.

40.     After the initial Form S-1 was filed, Telford became the auditor's primary contact, providing updated financial statements each quarter while the Form S-1 was being reviewed.

41.     Each of IMMA's registration statements contained false and misleading statements, including misrepresenting:

(a)     That the straw CEO was the sole officer, director, and employee

of IMMA.  These statements were false and misleading because there was no mention of McDiarmid's and Telford's roles as control persons and promoters.  The sole mention of Telford was that he controlled the stock of Pompeii.

(b)     That IMMA "depend[s] upon the continued contributions of our executive officer [who] handles all of the responsibilities in the area of corporate administration and business development."  In fact, IMMA did not depend upon the straw CEO, and McDiarmid and Telford, rather than she, handled IMMA's administrative and corporate matters.

(c)     That the beneficial owners of 5% or more of IMMA's common stock were not affiliates.  The S-1s identified the straw CEO's sister, who had no shares, and the principal of Morpheus but not Pompeii, which owned 7.4% (825,000 shares).  The only mention of Pompeii's ownership was false, namely that it only owned 4.46% (500,000 shares), and there was no mention of McDiarmid's and Telford's control of Pompeii, nor that Telford controlled Ecogenics, which held 275,000 or 2.5% of the shares pursuant to its purported consulting agreement with IMMA, for beneficial ownership of 9.9%.

(d)     That the private placements were legitimate, because no private placements were ever authorized.  The straw CEO never signed the subscription agreements and the sham private placement investors did not receive stock certificates bearing restrictive legends, nor any stock certificates at all.

(e)     That IMMA had capital from the straw CEO's and Morpheus's purchase of "founders' shares" and a loan from Morpheus, neither of which was true.

**D.     Misrepresentations to IMMA's Market Maker**

42.     Once IMMA's registration statement was declared effective, McDiarmid then worked with a market maker to file a Form 211 application with FINRA so that the market maker could publish quotes for IMMA stock, pursuant to Exchange Act Rule 15c2-11, and thereby enable public trading.  The market maker included the registration statement as part of its application.

43.     The market maker sent McDiarmid documents to obtain additional details regarding IMMA's securities offerings, the ownership and control of its shares, and the identity of any person who controlled or ran the company. McDiarmid prepared the responses, which repeated the false and misleading statements from the Form S-1 and indicated that McDiarmid was a "consultant," when in fact he was a control person and promoter.

44.     The market maker requested documents showing how the shareholders obtained their stock.  McDiarmid submitted the phony subscription and consulting agreements, which falsely appeared to have been signed by the straw CEO.

45.     FINRA approved the Form 211 application on December 26, 2013. McDiarmid then worked with the market maker and its clearing firm to obtain Depository Trust Corporation ("DTC") eligibility for IMMA's stock, enabling the stock trades to settle electronically.

**E.     McDiarmid and Telford Obtain Shares for Subsequent Distribution**

46.     In November 2013, nominee Ecogenics obtained 625,000 shares of IMMA stock from the Form S-1 offering.  First, the straw CEO's sister signed a stock purchase agreement and stock power, which transferred her 500,000 Form S-1 shares to Ecogenics for $0.15 per share.  The straw CEO's sister signed the documents at McDiarmid's instruction, and was not aware that she owned any shares.

47.     Second, another individual, "Mr. C," signed a stock power and entered into a consulting agreement with Ecogenics whereby Mr. C would transfer his 125,000 Form S-1 shares in return for business and accounting services.  Mr. C was a Form S-1 selling shareholder who purchased his shares from one of the private placement investors.

48.     After IMMA's transfer agent cancelled the straw CEO's sister's and Mr. C's certificates and issued new ones for a total of 625,000 shares in Ecogenics' name, Telford then submitted a request to Ecogenics' brokerage firm to deposit the newly acquired IMMA shares.  In the deposit request questionnaire, Telford stated that

Ecogenics and its affiliates only held 625,000 shares, even though he knew that he controlled at least 1.725 million shares. Telford also submitted the false and misleading Form S-1, the sham consulting agreement between IMMA and the straw CEO's sister, and another sham consulting agreement, between Ecogenics and the straw CEO's sister.

49.     On March 7, 2014, Telford deposited additional IMMA shares into Pompeii's account. In the deposit request questionnaire, Telford stated that Pompeii beneficially owned and controlled only the 500,000 shares it sought to deposit and that Pompeii had not been an affiliate of the company under Rule 144(a)(1) for the past three months.

50.     These statements were false and misleading because Pompeii had never owned less than 825,000 shares (7.4%) and, as Telford knew or was reckless in not knowing, Pompeii was controlled by himself and McDiarmid.

**F.      Misrepresentations in IMMA's Periodic Reports and to IMMA's Auditor**

51.     In 2013 and 2014, McDiarmid and Telford had IMMA voluntarily file quarterly reports with the SEC.

52.     McDiarmid prepared an initial draft of each quarterly report, while Telford was the main contact with the auditor.

53.     Telford typically prepared the financial statements that would be included in the quarterly reports and sent them to McDiarmid and the auditor; Telford also responded to the auditor's requests for additional information.

54.     Once the draft report quarterly became close to final, McDiarmid or Telford inserted the financial statements and submitted it to the Edgarizing agent. After the auditor signed off on the report, either McDiarmid or Telford instructed the Edgarizing agent to file the quarterly report with the SEC.

55.     Despite her titles, the straw CEO had no involvement in IMMA's periodic reports. Rather, McDiarmid and Telford made it appear as though she signed and transmitted the quarterly confirmations and the engagement and

10

management representation letters that were sent to the auditors.  McDiarmid completed the disclosure questionnaire that the auditor sent to the straw CEO, and drafted the text of the email she sent to transmit the responses.

56.   IMMA's Form 10-K reports, for the years ending October 31, 2013 and 2014, repeated the false and misleading information contained in the registration statements regarding the straw CEO's purported role, IMMA's dependence upon her, the identity of all the individuals who controlled and ran the company, and the beneficial owners, and misrepresented that there was a loan from Morpheus.

57.   IMMA's Form 10-Q reports for the same period repeated the false and misleading information contained in the registration statements regarding the straw CEO's purported role without mentioning McDiarmid's and Telford's roles as control persons and promoters, and claimed falsely that IMMA had a loan from Morpheus.

58.   On April 14, 2014, the British Columbia Securities Commission ("BCSC") issued a cease trade order in IMMA's securities based upon the company's failure to file its interim financial statements for the first quarter of fiscal year 2014.

59.   The straw CEO learned about the cease trade order on or about September 1, 2014.  On October 28, 2014, she resigned her IMMA officer positions, and on December 19, 2014, resigned her director position.

**G.   McDiarmid's and Telford's False Promotional Campaign**

60.   By June 2014, McDiarmid and Telford began to organize a promotional campaign to liquidate their IMMA shares, including a boiler room and email blasts. The campaign began in October 2014 and continued into May 2015, during which time McDiarmid and Telford traded their shares for net proceeds of approximately $3.1 million.

61.   Acting through a nominee, McDiarmid and Telford reserved the web domain, http://www.directinfoshare.com.  McDiarmid and Telford paid for this domain name through their nominees until July 2015.

62.   McDiarmid and Telford designed the website to make it appear as if

11

Direct Info Share was an experienced stock research firm, with multiple subscribers and client companies, specializing in issuers that trade in the pink sheets.  In fact, Direct Info Share was a brand new enterprise that McDiarmid and Telford created to promote IMMA and it had no subscriber base or clients.

63.    From October or November 2014, Direct Info Share employees cold-called and emailed potential investors in the US and Canada, primarily senior citizens, to recommend IMMA.  The cold callers urged prospective investors to purchase IMMA stock through their brokerage accounts, in some instances encouraging them to liquidate some or all of their portfolios to do so.

64.    The cold callers also falsely represented that IMMA's stock price would increase up to 100%; that IMMA was trying to raise its stock price so that it could trade on the NASDAQ; and that a major announcement was forthcoming.

65.    From April 26, 2015 to May 4, 2015, McDiarmid also had investor relations firms send email blasts and post articles touting IMMA as an investment.

66.    Through an investor relations firm broker he hired, McDiarmid selected four investor relations firms that distributed over 800,000 emails about IMMA, beginning on April 27, 2015 and continuing through April 30, 2015.

67.    The email blasts called IMMA, among other things, a "MUST BUY" and a "ground floor opportunity," comparing it favorably to well known auction-houses and directing readers to IMMA's SEC filings.  While the emails stated that the investor relations firm broker had compensated the investor relations firm, the emails did not disclose that McDiarmid had hired and paid the broker.

68.    During the initial email blast period (April 26 to May 1, 2015), IMMA's stock price increased from $1.39 to 1.62 per share, a 16.5% increase, on average daily trading volume of about 50,000 shares, compared to 64,700 shares over the previous month, about a 23% decrease.

69.    The email blast on May 4 and the boiler room efforts, however, could not sustain IMMA's stock price, which dropped precipitously over the next three

1   days from $1.62 per share on May 1 to $0.17 per share on May 6, 2015, an 89.5%

2   drop.  Average daily trading volume increased nearly six-fold, from 50,000 to

3   339,000 shares, compared to the first week of the email blasts.

4         **H.**    **McDiarmid's and Telford's Sales of IMMA Stock**

5        70.    McDiarmid and Telford profited by selling 2.48 million IMMA shares

6   into the increased demand created by their promotion, for net proceeds of about $3.1

7   million.

8        71.    From October 9, 2014 to June 15, 2015, McDiarmid and Telford sold

9   900,000 shares for proceeds of about $1.2 million from the Pompeii account, 1.6

10  million shares through the Ecogenics accounts for about $2.3 million, and 28,000

11  shares for $36,000 out of the Denon account.  They also purchased 294,000 IMMA

12  shares for about $400,000 through the Denon account in an apparent attempt to

13  support the stock price as they dumped Pompeii's and Ecogenics' shares.

14       72.    McDiarmid and Telford promptly wired the proceeds of their sales to

15  Pompeii's and Ecogenics' overseas accounts.

16  **I.**    **Defendants' Fraud Violations**

17        **1.**    **Defendants' misstatements were material**

18       73.    McDiarmid's and Telford's false and misleading statements in IMMA's

19  Form S-1 and its periodic filings were material and would have been important to

20  investors.  Investors would have wanted to know of McDiarmid's statements to the

21  market maker, Telford's statements to the brokers, and their representations to

22  IMMA's auditor, concerning the straw CEO's role as the titular head of IMMA; their

23  own undisclosed roles as the company's control persons and promoters; the sham

24  private placements and "founders' shares"; the phony consulting agreements, internal

25  memoranda and loan document; and the true beneficial owners of IMMA's stock.

26       74.    Investors would have considered it important in their investment

27  decision to know that the straw CEO was merely a puppet CEO who held no shares,

28  while McDiarmid and Telford controlled the company and, through their nominees,

covertly controlled its shares.

### 2. Defendants' Roles in the Fraudulent Scheme

75. McDiarmid and Telford each engaged in conduct that had the principal purpose and effect of creating false appearances of fact in furtherance of their fraudulent scheme.

76. McDiarmid, among other things:

(a) Installed the straw CEO as IMMA's sole officer and director to hide his control, and give the impression that IMMA would be run by a person with significant fine and decorative art auction experience;

(b) Fabricated documents to make it appear as if IMMA were an actual company, including the Morpheus loan agreement and the internal memoranda from the straw CEO falsely stating that she received proceeds from the loan and her own purchase of IMMA shares;

(c) Conducted unauthorized private placements and used the straw CEO's signature without her knowledge or consent to make it appear as if IMMA had actual investors;

(d) Fabricated consulting agreements, including the straw CEO's sister's, and used the straw CEO's signature without her knowledge or consent to make it appear, in part, as if IMMA was pursuing its auction business by locating potential art and décor suppliers;

(e) Worked with Telford to create false and misleading registration statements and periodic filings;

(f) Providing false and misleading information, including fabricated documents from the unauthorized private placements, to the market maker for their consideration in deciding whether to file a Form 211 application for clearance to publish stock quotes and thereby enable public trading, and to IMMA's auditor;

(g) Fabricated the straw CEO's sister's consulting agreement with Ecogenics and instructed the straw CEO's sister to sign stock transfer documentation

14

so that he and Telford could obtain additional shares from the registered public offering;

     (h)    Created and implemented the promotional campaign; and

     (i)    Purchased IMMA shares through a nominee to hide his attempts to support the trading price as he dumped shares through other nominees.

77.    Telford, among other things:

     (a)    Worked with McDiarmid to create false and misleading registration statements and periodic filings;

     (b)    Fabricated documents and prepared financial statements to make it appear as if IMMA was an actual startup company with a commensurate financial condition, including to IMMA's auditor;

     (c)    Falsely represented to brokerage firms Pompeii's and Ecogenics' holdings of IMMA stock and concealed his own and McDiarmid's control person status; and

     (d)    Purchased IMMA shares through a nominee to hide his attempts to support the trading price as he dumped shares through other nominees.

### 3.    Defendants' scienter and negligence

78.    McDiarmid and Telford each acted with scienter.  McDiarmid and Telford knew, or were reckless in not knowing, that the representations contained in IMMA's SEC filings and in their statements to market makers, brokers and the company's auditor, were materially false and misleading.

79.    McDiarmid further sought to influence the straw CEO's sister to testify falsely in the SEC's investigation concerning, among other things, the phony consulting agreement and her relationship with Telford.

80.    In addition, McDiarmid and Telford failed to exercise reasonable care by making materially misleading representations concerning the straw CEO's role as the titular head of IMMA; their own undisclosed roles as the company's control persons and promoters; the sham private placements and "founders' shares"; the phony

consulting agreements and loan document, and the true beneficial owners of IMMA's stock.

81.   Because McDiarmid and Telford were IMMA's control persons, their scienter and negligence is imputed to it.

**J.   Defendants' Registration Violations**

82.   McDiarmid's and Telford's offers and sales of IMMA stock to the public from nominee Ecogenics' account were not registered with the SEC, and no exemption from registration applied.

83.   IMMA's registration statement registered the offer and sale of the shares supposedly belonging to the selling stockholders, including the straw CEO's sister; however, the shares actually belonged to McDiarmid and Telford, because the straw CEO's sister's consulting agreement was a sham and she never received any shares.

84.   Because the straw CEO's sister's shares were actually controlled by McDiarmid and Telford, who were the company's control persons, she acted as an issuer with respect to the public offers and sales of IMMA's stock by Ecogenics.

85.   Ecogenics acted as an underwriter with respect to the offers and sales of IMMA's stock to the public, because through McDiarmid and Telford obtained the shares from the straw CEO's sister, with a view to distributing the shares to the public.

86.   McDiarmid and Telford effected the offers and sales from Ecogenics' account.

87.   According to IMMA's Form S-1s and Forms 10-K filed in 2013 and 2014, IMMA was a shell company, precluding use of the Rule 144 safe harbor for offers and sales of its stock.

88.   McDiarmid and Telford were also necessary participants and a substantial factor in Ecogenics' offers and sales of IMMA shares to the public.  Together they created IMMA, registered the selling shareholder offering, and orchestrated the straw CEO's sister's sham consulting agreement and sale of stock from herself to Ecogenics.

89.   But for the actions of McDiarmid and Telford, Ecogenics' unregistered

distribution of IMMA stock would not have occurred.

## FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c)**

**(against all Defendants, and against Defendants McDiarmid and Telford**

**as control persons of Defendant IMMA)**

90.     The SEC realleges and incorporates by reference paragraphs 1 through 87 above.

91.     Defendants McDiarmid, Telford and IMMA engaged in a scheme to defraud by creating IMMA, taking it public, and profiting from a pump and dump of its stock.  By taking steps to conceal their roles as undisclosed control persons— including falsifying documents, creating sham transactions, and directing the actions of a puppet CEO— McDiarmid and Telford created the false appearance that IMMA was a legitimate public company run by the straw CEO.  In fact, McDiarmid and Telford controlled the company and its shares through their nominee companies. McDiarmid and Telford made materially misleading statements in IMMA's registration statement and periodic filings, to IMMA's auditor, and to market makers and brokers concerning IMMA's stockholders, owners and control persons, in order to conceal their control of the company.  McDiarmid and Telford organized a misleading promotional campaign, through a boiler room and email blasts, which they used to inflate IMMA's stock price and then sell their holdings, through their nominees' accounts, for net proceeds of approximately $3.1 million.

92.     By engaging in the conduct described above, Defendants McDiarmid, Telford and IMMA, and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

93.     Defendants McDiarmid, Telford and IMMA, with scienter, employed devices, schemes and artifices to defraud; made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices or courses of conduct that operated as a fraud on the investing public by the conduct described in detail above.  Because of their control of IMMA, McDiarmid's and Telford's scienter is imputed to IMMA.

94.     By engaging in the conduct described above, Defendants McDiarmid, Telford and IMMA violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b) & 240.10b-5(c).

95.     Defendants McDiarmid and Telford were control persons of IMMA during the relevant period, because they possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of IMMA.  Accordingly, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), Defendants McDiarmid and Telford are liable to the SEC to same extent as IMMA for its violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a)(1) and (a)(3) of the Securities Act

### (against all Defendants)

96.     The SEC realleges and incorporates by reference paragraphs 1 through 87 above.

97.     Defendants McDiarmid, Telford and IMMA engaged in a scheme to

defraud by creating IMMA, taking it public, and profiting from a pump and dump of its stock.  By taking steps to conceal their roles as undisclosed control persons—including falsifying documents, creating sham transactions, and directing the actions of a puppet CEO— McDiarmid and Telford created the false appearance that IMMA was a legitimate public company run by the straw CEO.  In fact, McDiarmid and Telford controlled the company and its shares through their nominee companies. McDiarmid and Telford organized a misleading promotional campaign, through a boiler room and email blasts, which they used to inflate IMMA's stock price and then sell their holdings, through their nominees' accounts, for net proceeds of approximately $3.1 million.

98.   By engaging in the conduct described above, Defendants McDiarmid, Telford and IMMA, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

99.   Defendants McDiarmid, Telford and IMMA, with scienter, employed devices, schemes and artifices to defraud; with scienter or negligence, and, with scienter or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.  Because of their control of IMMA, McDiarmid's and Telford's scienter is imputed to IMMA.

100.   By engaging in the conduct described above, Defendants McDiarmid, Telford and IMMA violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

### THIRD CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

19

**Violations of Section 17(a)(2) of the Securities Act**

**(against Defendants McDiarmid and Telford)**

101.   The SEC realleges and incorporates by reference paragraphs 1 through 87 above.

102.   McDiarmid and Telford obtained investor funds via materially misleading statements in IMMA's registration statement and periodic filings and to the company's auditors, market makers and brokers, concerning IMMA's stockholders, owners, and control persons, in order to conceal their control of the company.  McDiarmid and Telford sold their holdings, through their nominees' accounts, for net proceeds of approximately $3.1 million.

103.   By engaging in the conduct described above, Defendants McDiarmid and Telford, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly, with scienter or negligently, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

104.   By engaging in the conduct described above, Defendants McDiarmid, and Telford violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. §§ 77q(a)(2).

**FOURTH CLAIM FOR RELIEF**

**Unregistered Offer and Sale of Securities**

**Violations of Sections 5(a) and 5(c) of the Securities Act**

**(against Defendants McDiarmid and Telford)**

105.   The SEC realleges and incorporates by reference paragraphs 1 through 87 above.

106.   McDiarmid and Telford, through nominee Ecogenics, offered and sold

shares of IMMA to the public, for which no registration statement was in effect. Because McDiarmid and Telford controlled the straw CEO's sister's shares, she acted as an issuer for the sales, and their nominee Ecogenics obtained the shares with a view to distribution, acting as an underwriter.  No exemption from registration was available.

107.   Defendants McDiarmid and Telford, and each of them, directly or indirectly, singly and in concert with others, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

108.   Defendants McDiarmid and Telford, and each of them, were a necessary participant and a substantial factor in Ecogenics' unregistered offers and sales of IMMA stock.

109.   By engaging in the conduct described above, Defendants McDiarmid and Telford have violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c), 15 U.S.C. §§ 77e(a) & 77e(c).

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### **II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining McDiarmid, Telford and IMMA, and their

officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §77q(a)(1) and (a)(3)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining McDiarmid and Telford, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a)(2) of the Securities Act [15 U.S.C. §77q(a)(2)].

### IV.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining McDiarmid and Telford, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

### V.

Order Defendants McDiarmid and Telford to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

### VI.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VII.

Enter orders against Defendants McDiarmid and Telford, pursuant to Sections 20(e) and 20(g) of the Securities Act, 15 U.S.C. § 77t(e), (g), and Sections 2l(d)(2) and 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(2), (6), prohibiting each of them from:  (1) acting as an officer or director of any issuer that has a class of securities registered pursuant to Section  12 of the Exchange Act, 15 U.S.C. § 78l or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d); and (2) prohibiting each of them from participating in an offering of penny stock.

## VIII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## IX.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  September 29, 2017

*/s/ Amy Jane Longo*

Amy Jane Longo
Roberto A. Tercero
Attorneys for Plaintiff
Securities and Exchange Commission

23