AMY JANE LONGO, Cal. Bar. No. 198304
Email: longoa@sec.gov
DONALD W. SEARLES, Cal. Bar. No. 135705
Email: searlesd@sec.gov
ROBERTO A. TERCERO, Cal. Bar No. 143760
Email: terceror@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka Patel, Associate Regional Director
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> JASON McDIARMID, KENNETH TELFORD and INTERACTIVE MULTI-MEDIA AUCTION CORP. (aka STOP SLEEP GO INC.) <br><br> Defendants. | Case No. 2:17-CV-07201-SVW-FFM <br><br> **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT KENNETH TELFORD** <br><br> Date: September 17, 2018 <br> Time: 1:30 p.m. <br> Ctrm: 10A <br> Judge: Hon. Stephen V. Wilson |

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ...................................................................................... 1

II.    SUMMARY OF UNDISPUTED FACTS ................................................ 2

       A.    IMMA's Formation and Initial Capitalization ............................. 2

       B.    Misrepresentations in IMMA's S-1 and Periodic Filings ........... 4

       C.    Misrepresentations in IMMA's Form 211 and Share Deposits ... 6

       D.    Defendants' Pump and Dump of IMMA's Shares ........................ 8

       1.    The Secret Promotional Campaign ............................................... 8

       2.    Telford Sells, Quickly Dispatching His Profits Offshore ........... 9

       E.    McDiarmid's Attempted Witness Tampering .............................. 10

       F.    Telford's Assertions of the Fifth Amendment in Deposition ..... 10

III.   ARGUMENT ......................................................................................... 11

       A.    **The Court Should Find that Telford Committed Securities Fraud** .... 11

             1.    Telford violated Section 17(a) and Section 10(b)/Rule 10b-5 ........ 11

             2.    Telford is liable for IMMA's Section 10(b)/Rule 10b/5 violations as its control person under Section 20(a) ...................... 17

       B.    The Court Should Find that Telford Violated Section 5 ............ 18

       C.    Telford's Fifth Amendment Assertions Further Support Liability ........... 20

       D.    The Court Should Impose Injunctive and Monetary Relief ...... 22

IV.    CONCLUSION ..................................................................................... 25

i

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

*Aaron v. SEC*,
   446 U.S. 680 (1980)..................................................................13

*Anderson v. Aurotek*,
   774 F.2d 927 (9th Cir. 1985) ...................................................22

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..................................................................12

*Avis Budget Group Inc. v. Cal. State Teachers' Ret. System*,
   552 U.S. 1162 (2008)................................................................15

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)..................................................................17

*Bassett v. City of Burbank*
   No. 14-CV-01348-SVW (CWx), 2014 U.S. Dist. LEXIS 194210 (C.D.
   Cal. Nov. 5, 2014)....................................................................25

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..................................................................11

*Curtin v. City of Orange*
   No. CV 16-00591-SVW-PLA, 2017 U.S. Dist. LEXIS 216939 (C.D.
   Cal. Aug. 1, 2017)....................................................................27

*Doe ex rel. Rudy-Glanzer v. Glanzer*,
   232 F.3d 1258 (9th Cir. 2000) ..................................................26

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976)..................................................................13

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ....................................................17

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983)..................................................................13

*Hollinger v. Titan Capital Corp.*,
   914 F.2d 1564 (9th Cir. 1990) ..................................................20

*In re CitiSource, Inc. Sec. Litigation*,
   694 F. Supp. 1069 (S.D.N.Y.1988).........................................21

*Janus Capital Group, Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011)..................................................................18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)..................................................................11

*Merrill Lynch, Pierce, Fenner & Smith Inc., v. Dabit*,
   547 U.S. 71 (2006)...............................................................................14

*Nationwide Life Ins. Co. v. Richards*,
   541 F.3d 903 (9th Cir. 2008) .......................................................25, 26

*Sanchez v. Vild*,
   891 F.2d 240 (9th Cir. 1989) ...............................................................12

*SEC v. Alpha Telecom, Inc.*,
   187 F. Supp. 2d 1250 (D. Or. 2002) ....................................................22

*SEC v. Benger*,
   931 F. Supp. 2d 904 (N.D. Ill. 2013)....................................................18

*SEC v. Benson*,
   657 F. Supp. 1122 (S.D.N.Y. 1987) ......................................................25

*SEC v. Burns*,
   816 F.2d 471 (9th Cir. 1987) ...............................................................13

*SEC v. Cavanagh*,
   155 F.3d 129 (2d Cir. 1998) .................................................................23

*SEC v. CMKM Diamonds, Inc.*,
   635 F. Supp. 2d 1185 (D. Nev. 2009) ..................................................29

*SEC v. CMKM Diamonds, Inc.*,
   729 F.3d 1248 (9th Cir. 2013).............................................................23

*SEC v. Colello*,
   139 F.3d 674 (9th Cir. 1998) ...............................................................26

*SEC v. Curshen*,
   888 F. Supp. 2d 1299 (S.D. Fl. 2012)...................................................16

*SEC v. Farmer*,
   No. 4:14-cv-2345, 2015 U.S. Dist. LEXIS 136702
   (S.D. Tex. Oct. 7, 2015) ....................................................16, 18, 20, 24

*SEC v. Fehn*,
   97 F.3d 1276 (9th Cir. 1996) ...............................................................17

*SEC v. First Pacific Bancorp*,
   142 F.3d at 1193 ..................................................................................31

*SEC v. GLT Dain Rauscher, Inc.*,
   254 F.3d 852 (9th Cir. 2001) ...........................................................12,13

*SEC v. Gordon*,
   822 F. Supp. 2d 1144 (N.D. Okla. 2011) .......................................20, 28

*SEC v. Hughes Capital Corp.*,
   124 F.3d 449 (3d Cir.1997) .................................................................13

iii

*SEC v. Imperiali, Inc.*,
   594 F. App'x 957 (11th Cir. 2014) ..................................................22

*SEC v. Jammin Java Corp.*,
   No. 15-cv-08921 SVW (MRWx), 2017 U.S. Dist. LEXIS 157730 (C.D.
   Cal. Sep. 14, 2017) ..........................................................28, 30, 31

*SEC v. JT Wallenbrock & Assocs.*,
   440 F.3d 1109 (9th Cir. 2006) .......................................................29

*SEC v. Koracorp Indus., Inc.*,
   575 F.2d 692 (9th Cir. 1978) .........................................................28

*SEC v. Lauer*,
   No. 03-80612-CIV, 2008 WL 4372896 (S.D. Fla. Sept. 24, 2008) ................27

*SEC v. Luna*,
   No. 2:10-CV-2166-PMP-CWH, WL 794202 (D. Nev. Feb. 26, 2014) ......26, 27

*SEC v. Manor Nursing Centers, Inc.*,
   458 F.2d 1082 (2d Cir. 1972) .........................................................21

*SEC v. Murphy*,
   626 F.2d 633 (9th Cir. 1980) ......................................................22, 28

*SEC v. Patel*,
   61 F.3d 137 (2d Cir. 1995) ...........................................................29

*SEC v. Phan*,
   500 F.3d 895 (9th Cir. 2007) .........................................................23

*SEC v. Platforms Wireless Int'l Corp.*,
   559 F. Supp. 2d 1091 (S.D. Cal. 2008) ............................................21

*SEC v. Platforms Wireless Int'l Corp.*,
   617 F.3d 1072 (9th Cir. 2010) ..............................................13, 17,22

*SEC v. Poirier*,
   140 F. Supp. 2d 1033 (D. Ariz. 2001) ....................................19, 24, 29

*SEC v. Prime One Partners, Corp*
   No. CV 94-3322 SVW (GHKx), 1995 U.S. Dist. LEXIS 22587 (C.D.
   Cal. June 9, 1995) ....................................................................27

*SEC v. Ralston Purina Co.*,
   346 U.S. 119 (1953)..................................................................23

*SEC v. Rana Research, Inc.*,
   8 F.3d 1358 (9th Cir. 1993) ..........................................................17

*SEC v. Reynolds*
   No. 3:08-CV-0438-B, 2013 U.S. Dist. LEXIS 100941 (N.D. Tex. July
   19, 2013)...............................................................................24

*SEC v. Sells*,
   No. C 11-4941 CW, 2012 WL 3242551 (N.D. Cal. Aug. 10, 2012) ...............18

*SEC v. Todd,*
   642 F.3d 1207 (9th Cir. 2011) ........................................................20

*SEC v. Zandford,*
   535 U.S. 813 (2002)..........................................................................14

*SEC v. Zouvas*
   No. 3:16-cv-0998-CAB-(DHB), 2016 U.S. Dist. LEXIS 161255 (S.D.
   Cal. Nov. 21, 2016)..........................................................................14

*Simpson v. AOL Time Warner*, *Inc.*,
   452 F.3d 1040 (9th Cir. 2006) ........................................................15

*Steadman v. SEC*,
   603 F.2d 1126 (5th Cir.1979) .........................................................31

*Superintendent of Ins. v. Bankers Life & Casualty Co*.,
   404 U.S. 6 (1971)..............................................................................14

*Taylor v. List*,
   880 F.2d 1040 (9th Cir. 1989) ........................................................12

*TSC Indus., Inc. v Northway*,
   426 U.S. 438 ....................................................................................17

*TSC Indus., Inc. v. Northway*,
   426 U.S. 438 (1976)..........................................................................17

*United States v. Nader*,
   542 F.3d 713 (9th Cir. 2008) ..........................................................14

*United States v. Naftalin*,
   441 U.S. 768 (1979)..........................................................................14

*Utah Lighthouse Ministry v. Foundation for Apologetic Info. & Research*,
   527 F.3d 1045 (10th Cir. 2008) ......................................................14

**Securities Act of 1933**

Section 17(a)
   [15 U.S.C. § 77q(a)] ................................................................*passim*

Section 17(a)(1)
   [15 U.S.C. § 77q(a)(1)]...............................................................13, 14

Section 17(a)(2)
   [15 U.S.C. § 77q(a)(2)]....................................................................15

Section 17(a)(2)-(3)
   [15 U.S.C. § 77q(a)(2)-(3)].............................................................13

Section 17(a)(3)
   [15 U.S.C. § 77q(a)(3)]....................................................................14

Section 2(a)(11)
   15 U.S.C § 77b..................................................................................21

Section 20(b)
   [15 U.S.C. § 77t(b)] ........................................................................24

Section 20(d)(1)
   [15 U.S.C. § 77t(d)(1)] ...................................................................25

Section 20(d)(2)
   [15 U.S.C. § 77t(d)(2)] ...................................................................26

Section 20(d)(2)(C)
   [15 U.S.C. § 77t(d)(2)(C)] ..............................................................26

Section 4(a)(1)
   15 U.S.C. § 77d..............................................................................21

Section 5
   [15 U.S.C. § 77e] ...........................................................................20

Section 5(a)
   [15 U.S.C. § 77e(a)] .........................................................................1

Section 5(c)
   [15 U.S.C. § 77e(c)] .........................................................................1

Section 6(a)
   [15 U.S.C. § 77f(a)] .......................................................................20

**Securities Exchange of 1934**

Section 10(b)
   [15 U.S.C. § 78j(b)] ................................................................*passim*

Section 20(a)
   [15 U.S.C. § 78t(a)] ............................................................2, 18, 19

Section 21(d)
   [15 U.S.C. § 78u(d)] ......................................................................24

Section 21(d)(3)(A)
   [15 U.S.C. § 78u(d)(3)(A)] ............................................................25

Section 21(d)(3)(B)(iii)
   [15 U.S.C. § 78u(d)(3)(B)(iii)] .......................................................26

**FEDERAL REGULATIONS**

Rule 10b-5
   [17 C.F.R. § 240.10b-5].........................................................*passim*

Rule 10b-5(a)
   [17 C.F.R. § 240.10b-5(a)] ............................................................14

Rule 10b-5(b)
   [17 C.F.R. § 240.10b-5(b)] ............................................................15

Rule 10b-5(c)
[17 C.F.R. § 240.10b-5(c)] .................................................................14

Rule 12b-2
[17 C.F.R. § 240.12b-2] ....................................................................18

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 56(a) .............................................................................12

## I.    **INTRODUCTION**

Plaintiff Securities and Exchange Commission ("SEC") moves for summary judgment against defendant Kenneth Telford ("Telford"), who, with co-defendant Jason McDiarmid ("McDiarmid"), ran an illegal pump and dump scheme in the penny stock of defendant Interactive Multi-Media Auction Corporation ("IMMA").

The undisputed evidence establishes that Telford and McDiarmid carefully orchestrated a four-year scheme to defraud stockholders of IMMA, purportedly a "development stage" Hong Kong-based company intending to become an Internet fine art auctioneer. IMMA never generated any revenues and it provided no products or services. Nonetheless, Telford and McDiarmid, as undisclosed insiders, made millions promoting and selling IMMA's worthless stock to the unsuspecting public.

From its inception, Telford took key steps to execute the fraud. First, he worked to register IMMA as a public company, using sham initial capitalization transactions and a straw CEO, while concealing his and McDiarmid's control of IMMA in the company's S-1 registration statement and periodic SEC filings. After IMMA's stock was cleared for public trading, Telford deposited shares in the accounts of nominees he controlled, masking from the brokerages his and McDiarmid's roles as IMMA's undisclosed control persons. He and McDiarmid then secretly funded a promotional campaign touting IMMA's stock, causing it to spike, notwithstanding the company's lack of any product, service or revenue. Telford simultaneously directed the nominees' sales of stock to the public. His trading accounted for the majority of the stock's activity. He reaped over $3.3 million in net proceeds, which he promptly transferred to offshore bank accounts. When the promotional campaign ended, the stock fell more than 50%, leaving the public shareholders holding the bag. At his deposition, Telford invoked his Fifth Amendment right against self-incrimination and refused to testify.

By his conduct, Telford violated the registration and antifraud provisions of Sections 5(a) and (c) and 17(a) of the Securities Act of 1933 (the "Securities Act"),

and the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934
(the "Exchange Act"), and Rule 10b-5 thereunder, and is liable under Exchange Act
Section 20(a), as IMMA's control person.[1]  Because there are no genuine issues of
material fact, the Court should find Telford liable and award relief against him.

## II.    SUMMARY OF UNDISPUTED FACTS

Telford is a Canadian citizen residing in the Philippines.  SF ¶ 1.[2]  He is a
certified public accountant ("CPA") in Washington State, and a member of the
Chartered Professional Accountants of British Columbia.   SF ¶¶ 2-3.  He has served
as the disclosed chief financial officer of at least four public companies registered
with the SEC.  SF ¶ 5.  Telford provides consulting services through Hong Kong-
based Denon Capital Ltd. ("Denon"), of which he is the sole director, officer and
shareholder.  SF ¶¶ 17-19.[3]  IMMA was not Telford's only work with McDiarmid.
Prior to IMMA, the two served as co-officers of another Hong Kong-based, revenue-
less "development stage" penny stock company, Essential Innovations Technology,
Corp. ("ESIV"), with Telford as CFO and McDiarmid as CEO.  SF ¶¶ 6-7.  Telford
and McDiarmid call each other "friends" with a "close working relationship";
IMMA's auditors understood them to work together frequently.  SF ¶¶ 8-10.

### A.    IMMA's Formation and Initial Capitalization

McDiarmid initially approached his acquaintance Amber McCandless,
concerning the notion of turning her defunct art-based cable television show, Art
Showcase Auction, into a public company and online art auction.  SF ¶ 45.   In early
2011, Telford worked with McDiarmid in preparing to take the company public.  SF ¶

---

[1] Defendants McDiarmid and IMMA have both defaulted.  *See* Dkt. Nos. 24, 37.
[2] Citations to "SF" refer to the SEC's Statement of Uncontroverted Facts and
Conclusions of Law filed concurrently herewith.
[3] Telford has signatory authority over Denon's bank account at HSBC in Hong Kong
and over its Charles Schwab brokerage account, which Telford opened in November
2005.  SF ¶¶ 20-23.

49.  McDiarmid came up with the name IMMA; McCandless had no understanding of her role (other than providing her artistic background), and no idea Telford was involved.  SF ¶¶ 46, 50.  After IMMA was incorporated in July 2012 in the British Virgin Islands, Telford and McDiarmid executed documents creating the false appearance that IMMA had numerous third-party investors and outside consultants; Telford supplied those documents to auditor Ingenium Accounting Associates ("Ingenium"), for IMMA's Form S-1 prospectus.  SF ¶¶ 47, 57, 71, 74, 80.

***Sham private placement.***    To give IMMA an appearance of legitimacy, defendants falsified subscription agreements for IMMA stock.  McDiarmid signed a "verification" supposedly evidencing the receipt of $15,000 from twelve shareholders in the Philippines between September 15, 2012 and October 15, 2012, in exchange for 250,000 total shares.  SF ¶ 52.  Yet while the subscription agreements purport to bear Amber McCandless's signature, she never saw them, never knew of their existence, and never authorized them on IMMA's behalf.  SF ¶¶ 53-56.  Telford provided these unauthorized subscription agreements to Ingenium for IMMA's S-1 audit.  SF ¶¶ 53-57.

***Bogus consulting agreements***.  IMMA purported to issue millions of shares to six "consultants" in the fall of 2012.  At least five were undisclosed affiliates: Telford nominee Pompeii Finance Corp. ("Pompeii") received 825,000 shares; Telford nominee Ecogenics Ltd. ("Ecogenics"), 275,000; Telford's wife Maribel Fernandez, 750,000; Amber McCandless's sister Sienna McCandless, 1,000,000; and Monica Chu (of Morpheus Financial Corp., supposedly a lender of IMMA's), 1,125,000 shares.  SF ¶¶ 44, 73.  While the consulting agreements again appeared to be signed by Amber McCandless, she never signed them, and had not even heard of Ecogenics or Pompeii.  SF ¶¶ 76-79.  Telford executed the illicit agreement for Pompeii, and supplied the consulting agreements to the auditor.  SF ¶¶ 74, 80.

***Fictitious founders' shares***.  The last piece of IMMA's misleading initial capitalization was 6,225,000 "founders' shares" purportedly issued to Amber

3

McCandless and to Morpheus in July 2012.  SF ¶¶ 59-62.  As with the other transactions, these shares—though reflected in documents purporting to be signed by Amber McCandless—were issued without her knowledge or consent and were not authorized by her.  SF ¶¶ 63-70.  She personally did not receive any shares, nor pay any funds in to capitalize the company.  *Id.*  Nor did she authorize the "loan agreement" pursuant to which Morpheus supposedly lent money to IMMA.  *Id.*[4] Telford again included these materials for Ingenium's S-1 audit.  SF ¶ 71.  Neither of the McCandless sisters ever received (nor sold) any IMMA shares.  SF ¶¶ 63, 78.

### B.   Misrepresentations in IMMA's S-1 and Periodic Filings

In his answer to the SEC's complaint, Telford admitted the following with respect to his work for IMMA:  (1) that he commented on drafts of IMMA's Form S-1s registration statement; (2) that he was "in contact with the auditor" after the S-1 was filed; (3) that he "typically prepared IMMA's financial statements"; (4) that he "prepared certain portions of IMMA's periodic filings"; and (5) that he "signed forms to open brokerage accounts into which IMMA shares were deposited."  SF ¶¶ 91-94. Telford's correspondence with IMMA's outside auditors, counsel, market maker, and the brokers through which Telford sold IMMA's stock, compelled these admissions.

Ingenium's accountants viewed Telford as their primary contact, as did PLS CPA, the auditor that replaced Ingenium once it resigned in 2014 due to IMMA's lack of any operations.  SF ¶¶ 90, 95, 104-106.  Telford provided the auditors drafts of IMMA's financial statements, and addressed any revisions.  SF ¶ 90.  Telford was also copied on communications with IMMA's outside counsel, auditors, and its EDGAR agent (also its transfer agent) for approval, before IMMA's SEC filings issued.  SF ¶¶ 100-102.

***Misrepresentations in the S-1.***  IMMA's S-1 was initially filed on January 7,

---

[4] Morpheus had the same business address as Telford's three nominees that later sold IMMA stock, Denon, Pompeii and Ecogenics, as did ESIV.  SF ¶ 44.

2013; it was amended six times, and went effective on October 10, 2013.  SF ¶ 107.  Amber McCandless never signed or authorized her signature to be used on the S-1, though it too purported to bear her signature.  SF ¶ 108.  In addition, the S-1 contained several material misrepresentations concerning IMMA's ownership and control.  First, the S-1 stated that Amber McCandless was the sole officer and director of IMMA, stating misleadingly that IMMA "depend[s] upon the continued contributions of our executive officer [who] handles all of the responsibilities in the area of corporate administration and business development."  SF ¶¶ 109-110.  The S-1 omitted any reference at all to McDiarmid, notwithstanding his managerial and financial control over the company, nor did it disclose Telford's controlling role in IMMA.  SF ¶¶ 111-112 .

Second, the S-1 falsely described IMMA's related party transactions and the percentage of its shares beneficially owned by affiliates.  In describing the "selling security holders," the S-1 stated that, other than Telford's control over Pompeii's shares (and Chu's control over Morpheus's shares), "none of the selling security holders or their beneficial owners has had a material relationship with us other than as a security holder at any time within the past three years, or has ever been one of our officers or directors or an officer or director of our predecessors or affiliates."  SF ¶ 113.  No mention was made of Telford's or McDiarmid's involvement in IMMA's formation or capitalization or in the preparation of its SEC filings.

Further, the S-1 disclosed only one shareholder (other than the CEO) who beneficially owned five percent or more of the company's stock:  Monica Chu (indicating that she had voting and dispositive control of over shares held by Morpheus and another entity).  SF ¶ 115.  While the S-1 listed Pompeii as a selling shareholder for 500,000 shares, the 5% ownership and related party transaction disclosures omitted the fall 2012 consulting agreements where Ecogenics received 275,000 shares and Pompeii received a total of 825,000 shares, which brought Telford's combined holdings to 9.9% of the shares.  SF ¶¶ 116-117.  Neither Amber

McCandless nor Sienna McCandless received, nor provided consideration for, any of the shares attributed to them in the S-1; in reality, neither received any shares. SF ¶¶ 121-124. Finally, the S-1 incorporated the list of "private placement" selling shareholders and the consulting agreements and founders' shares that comprised IMMA's misleading and phony initial capitalization. SF ¶ 114, 121.

*Misrepresentations in periodic reports.* During McCandless' tenure as the nominal CEO, IMMA filed a Form 10-K report with the SEC for the year ended October 31, 2013, as well as Form 10-Q reports for the periods ending March 30, 2014 through September 30, 2014. SF ¶ 173. Though each bore her signature, McCandless never reviewed or signed any of these filings, nor authorized the use of her signature. SF ¶¶ 176, 185. IMMA's 2013 10-K contained the same misrepresentations that appeared in its S-1 as to the company's reliance on Amber McCandless, omitting any reference to McDiarmid's or Telford's roles. SF ¶¶ 177-179. The 2013 10-K also referenced the shares purportedly issued in the private placement, to McCandless and Morpheus, and through consulting agreements. SF ¶¶ 180-183. The 10-K did not disclose that none of these transactions were authorized by the CEO. *Id.* The 10-Qs repeated a subset of the same false information, namely the description of McCandless' role and the bogus Morpheus loan. SF ¶¶ 185-187.

Had IMMA's auditors known that the information Telford supplied them concerning IMMA's true control and capitalization—which pervaded the company's S-1 and its periodic filings—was materially false and misleading, they would not have signed off on IMMA's audits. SF ¶¶ 125-127.

## C. Misrepresentations in IMMA's Form 211 and Share Deposits

After IMMA's registration became effective, McDiarmid provided IMMA's market maker, Glendale Securities Inc. ("Glendale"), with much of the same false and misleading information that appeared in its S-1. SF ¶¶ 132-137. Included in the package McDiarmid provided Glendale for the Form 211 application were the sham subscription agreements and consulting agreements, as well as a list of shareholders,

including the never-issued "founders' shares." SF ¶ 135. Amber McCandless never saw the Form 211 application. SF ¶ 143. Had Glendale known the true state of IMMA's ownership and control, it would not have submitted the information to the Financial Industry Regulatory Authority ("FINRA"), to clear the stock to trade publicly on the over the counter markets. SF ¶¶ 145, 153-54.

Telford and McDiarmid then made misleading representations to deposit IMMA's shares as freely tradeable in the accounts of two nominees controlled by Telford—Pompeii and Ecogenics:

***Pompeii's Meyers Account.*** Telford opened Pompeii's brokerage account at Meyers & Assocs. in January 2014 (a joint account in Denon's and Telford's names), working with McDiarmid on the account application. SF ¶ 155.[5] Pompeii's bank account at HSBC in Hong Kong is also controlled by Telford. SF ¶ 31. Telford in February 2014 instructed IMMA's transfer agent to send 500,000 IMMA shares to Pompeii's account, representing to the broker that he had no connection with IMMA. SF ¶¶ 156, 159. Telford also signed a Rule 144 representation letter stating that Pompeii was not an affiliate of IMMA, and that it had only the 500,00 shares it was depositing with Meyers (omitting its other 325,000 shares). SF ¶ 161. Had Pompeii's broker known that Telford was an IMMA affiliate or that Pompeii's shareholdings were misrepresented, he would not have accepted the shares. SF ¶ 163.

***Ecogenics' Glendale Account***. Telford opened Ecogenics' first brokerage account with Glendale in 2013, and a second account in 2014. SF ¶¶ 164-65.[6] (Ecogenics also banked at HSBC in Hong Kong, in an account controlled by Telford). SF ¶¶ 40-41. In late 2013, McDiarmid directed Amber and Sienna McCandless to execute documents (1) purporting to transfer 500,000 IMMA shares

---

[5] Telford has admitted to being a director of Pompeii Finance and has held himself out as its sole owner, shareholder, director, and member. SF ¶ 26.

[6] Telford has admitted to being a director of Ecogenics, and has held himself out as its sole officer and owner. SF ¶¶ 34-38. In 2012, Pompeii became Ecogenics' director, with Telford as its authorized representative. *Id.*

from Sienna McCandless to Ecogenics pursuant to a November 2013 consulting agreement signed by Telford on Ecogenics' behalf; and (2) attesting that Ecogenics was not an affiliate of IMMA.  SF ¶¶ 81-84.  Neither McCandless sister understood Ecogenics' true affiliation when providing the responses McDiarmid directed, nor had Sienna McCandless ever received any shares she could "transfer."  SF ¶¶ 85-86.  Telford then signed forms to deposit the IMMA shares into Ecogenics' account, representing to Glendale that Ecogenics was not an affiliate of IMMA, and had only the shares it was depositing—omitting the 275,000 shares it previously received for its own consulting services to IMMA.  SF ¶¶ 166-170.[7]  Had Glendale known that Telford was an IMMA affiliate or that Ecogenics' shareholdings were misrepresented it would not have accepted the shares.  SF ¶¶ 171-172.

### D.   Defendants' Pump and Dump of IMMA's Shares

#### 1.   The Secret Promotional Campaign

McDiarmid and Telford next took steps to inflate IMMA's stock price, covertly funding a two-pronged touting campaign for its stock.  At the same time, Telford's nominee and undisclosed affiliate Denon—which received $704,900 wired in from Pompeii and Ecogenics— purchased over 630,000 shares of IMMA's stock in the public market, supporting the appearance of demand for the stock.  SF ¶ 21.

***Direct Info Share.***  In or about June 2014, Mary Rose Casin, who was paid $200,000 from Ecogenics and Pompeii, and who herself wired money to Telford to cover a debit in Pompeii's brokerage account, registered the domain name www.directinfoshare.com.  SF ¶¶ 188-189, 191.  Although Casin is listed as the billing contact, charges were billed to McDiarmid.  SF ¶ 190.  Direct Info Share's website described it as a "respected investor relations/financial communications company" that "specialize[d] in discovering undervalued companies" with "true and

---

[7] Telford also provided a stock power agreement purporting to show another 125,000 shares transferred to Ecogenics by a Mel Grace Carlos, for a total of 625,000 shares deposited with Glendale.  SF ¶¶ 166-167.

realistic potential for substantial growth…" SF ¶ 192.  Its agents cold-called potential investors to promote IMMA, at times encouraging them to use their retirement savings to invest.  SF ¶ 196.  The agents told investors they would likely double their money, and that the stock price was headed to $12 per share—despite the lack of any revenues, products or services.  SF ¶¶ 175, 197.  At no time did the representatives or the website disclose that Direct Info Share was run by IMMA insiders who were selling their own shares—which investors would have wanted to know.  SF ¶¶ 199-200.  After the campaign ended and the price fell, Direct Info Share and IMMA went dark; investors could reach no one at either entity.  SF ¶ 198.

**Think Ink Marketing**.  In April 2015, Ecogenics hired Think Ink Marketing, a penny stock investor relations firm, to coordinate marketing through a series of articles disseminated by investor relations firms.  SF ¶ 201.  Between April 26, 2015 and May 5, 2015, a slate of five different articles aggressively promoted IMMA's stock, calling it a "must buy", a "pure play equity investment opportunity" that offered "hefty profits" and was on a "clear upward path."  SF ¶ 205.  Though the emails disclosed that the firms received an "advertising fee," none revealed that the fee was paid IMMA insiders and sellers, which investors would have found significant.  SF ¶ 206.  The two week email campaign resulted in a 16.5% spike in IMMA's stock price; when the campaign ended, the price fell 51%.  SF ¶ 207.

## 2. Telford Sells, Quickly Dispatching His Profits Offshore

Between October 1, 2014 and May 29, 2015, Telford sold 2,865,250shares[8] of IMMA from Denon's, Pompeii's and Ecogenics' accounts, and received $3,316,235.48 in net proceeds.  SF ¶¶ 209, 212-213, 221-222, 225.  Telford's sales comprised at least two-thirds of IMMA's trading volume on more than a third of those trading days, and more than half the volume on over half the days.  SF ¶ 226.

---

[8] On January 28, 2015, IMMA announced a forward-split of the issued and outstanding shares of its common stock on the basis for four new shares for each share, which took effect on February 3, 2015.  SF ¶ 224.

As sales proceeds were received by the three nominees, Telford wired them out.  Between October 2015 and August 2015, Telford transferred over $3 million from the Denon, Pompeii and Ecogenics brokerage accounts to the entities' respective bank accounts in Hong Kong.  SF ¶¶ 210, 215, 223.  After Telford wired the last of the profits, Pompeii's broker developed suspicions about IMMA.  SF ¶ 218.  When Meyers determined to close the account in April 2015, Telford asked to get the remaining funds transferred to his personal account, and asked to deposit and trade shares of a new company, but was rebuffed on both counts.  SF ¶¶ 219-220.

### E.   McDiarmid's Attempted Witness Tampering

In November 2015, Sienna McCandless received an SEC investigative subpoena.  SF ¶ 227.  She provided the subpoena to Amber McCandless, who contacted McDiarmid.  SF ¶¶ 228-229.  In addition to obtaining counsel to represent her, McDiarmid sent Sienna McCandless a script of "General Comments," a list of "Documents to be Produced," and copies of the complete versions of her consulting agreements with IMMA and Ecogenics.  SF ¶ 230.  Sienna McCandless' relationships with McDiarmid and Telford were dramatically overstated in the script.  Whereas the script stated that McDiarmid was her 25-year "business associate," they were mere acquaintances; and while the script described Telford as her "business associate" for "a decade," she had actually never heard of him.  SF ¶¶ 231-232.

### F.   Telford's Assertions of the Fifth Amendment in Deposition

Telford asserted his Fifth Amendment right against self-incrimination in response to questions about every subject area at issue in the complaint, including: (1) his personal and professional background, including whether he is a licensed CPA; (2) his answer to the complaint and discovery responses; (3) his association with McDiarmid; (4) his control of or affiliation with Denon, Pompeii, and Ecogenics; (5) IMMA's formation, initial capitalization, and SEC filings; (6) IMMA's Form 211 Application; (7) his deposits of IMMA's shares in Pompeii's and Ecogenics' brokerage accounts for trading; (8) the promotional campaign for IMMA's stock; (9)

1  his sales of IMMA stock and disposition of the proceeds; (10) the SEC's subpoena to

2  Sienna McCandless; and (11) his net worth, assets or accounts.  SF ¶¶ 234-252.

3  **III.   ARGUMENT**

4      A party is entitled to summary judgment "if the pleadings, depositions, answers

5  to interrogatories, and admissions on file, together with the affidavits, if any, show

6  that there is no genuine issue as to any material fact and that the moving party is

7  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v.*

8  *Catrett*, 477 U.S. 317, 322-23 (1986).  A party moving for summary judgment meets

9  its burden by establishing, for each element of the claim or defense, that no

10 reasonable trier of fact could find for the opposing party.  *See Celotex*, 477 U.S. at

11 323.  Once the moving party has met its burden, the "nonmoving party must come

12 forward with 'specific facts showing that there is *a genuine issue for trial.*'"

13 *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

14 (emphasis in original).  The nonmoving party may not rest on conclusory allegations

15 or bald assertions, *see Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989), but must

16 come forward with significant probative evidence tending to support its contention

17 that material, triable issue of fact remain.  *See Anderson v. Liberty Lobby, Inc.*, 477

18 U.S. 242, 248-250 (1986); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).  A

19 "mere existence of a scintilla of evidence" does not suffice; rather, the nonmoving

20 party must present "concrete evidence from which a reasonable juror could return a

21 verdict in his favor."  *Liberty Lobby*, 477 U.S. at 252, 256.

22      **A.   The Court Should Find that Telford Committed Securities Fraud**

23          **1.   Telford violated Section 17(a) and Section 10(b)/Rule 10b-5**

24      The undisputed evidence shows that Telford committed securities fraud by

25 engaging in a scheme to defraud and making material misstatements.  Section 17(a)

26 prohibits fraud in the offer or sale of securities, and Section 10(b)/Rule 10b-5

27 thereunder prohibit fraud in connection with the purchase or sale of any security.  *See*

28 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *SEC v. GLT Dain*

1    *Rauscher*, *Inc*., 254 F.3d 852, 855 (9th Cir. 2001).  Violations of Section 17(a)(1) and

2    Section 10(b) require a showing of scienter, while violations of Section 17(a)(2)-(3)

3    only require a showing of negligence.  *Aaron v. SEC*, 446 U.S. 680 (1980).   Scienter

4    is defined as a "mental state embracing intent to deceive, manipulate or defraud."

5    *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  In the Ninth Circuit,

6    scienter may be established by a showing of either "deliberate recklessness" or

7    "conscious recklessness."  *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072,

8    1093 (9th Cir. 2010).  Recklessness may be inferred from circumstantial evidence.

9    *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390-91, n.30 (1983); *SEC v.*

10   *Burns*, 816 F.2d 471, 474 (9th Cir. 1987).   Negligence, by contrast, is the absence of

11   "reasonable prudence."  *Dain Rauscher, Inc.*, 254 F.3d at 856-57; *SEC v. Hughes*

12   *Capital Corp.*, 124 F.3d 449, 453–54 (3d Cir. 1997) (defining negligence as the

13   failure to exercise reasonable care or competence).

14               **a)    Telford's conduct occurred in the offer or sale of, and in**

15                      **connection with the purchase or sale, of securities**

16        Telford's conduct occurred "in the offer or sale," and "in connection with the

17   purchase or sale," of securities, in interstate commerce.[9]  The phrase "in connection

18   with the purchase or sale" of a security is met when the fraud alleged "coincides with

19   a securities transaction" (*see Merrill Lynch, Pierce, Fenner & Smith Inc., v. Dabit*,

20   547 U.S. 71, 85 (2006)), while the term "in connection with" requires only that there

21   be "deceptive practices touching" the purchase or sale of securities.  *See*

22   *Superintendent of Ins. v. Bankers Life & Casualty Co*., 404 U.S. 6, 12-13 (1971); *see*

23   *also SEC v. Zandford*, 535 U.S. 813, 819 (2002); *United States v. Naftalin*, 441 U.S.

24   768, 777-78 (1979) ("in the offer or sale of securities" in Section 17(a) is "broad

25

26   ―――――――――――――
     [9] Telephone, email and the Internet are instrumentalities of interstate commerce.  *See,*

27   *e.g., United States v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008); *Utah Lighthouse*
     *Ministry v. Foundation for Apologetic Info. & Research*, 527 F.3d 1045, 1054 (10th

28   Cir. 2008).

enough to cover the entire selling process.").   Telford sold IMMA's stock to the public, while deceiving investors through false SEC filings and a concealed promotional campaign.  He also deceived IMMA's auditors, market maker and the brokerage firms that accepted the IMMA shares he sold.  *See, e.g., SEC v. Zouvas,* No. 3:16-cv-00998-CAB(DHB), 2016 WL 6834028, at **8-9 (S.D. Cal. Nov. 21, 206) (material misstatements to market professionals actionable as a matter of law).

### b)     Telford engaged in a fraudulent scheme

Section 10(b)/Rule 10b-5(a) and (c) make it unlawful to "employ any device, scheme, or artifice to defraud" and "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a), (c).  Sections 17(a)(1) and (3) make it unlawful to employ any device, scheme, or artifice to defraud; or to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser of a security.  15 U.S.C. §§ 77q(a)(1), (3).  To be liable for a scheme to defraud, a defendant must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme.  *See Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds sub nom.*, *Avis Budget Group Inc. v. Cal. State Teachers' Ret. System*, 552 U.S. 1162 (2008).

The undisputed evidence shows that Telford engaged in a scheme to defraud.  Telford owned and controlled Pompeii and Ecogenics, and thus knew that their roles as IMMA's affiliates, and their actual shareholdings, as well as his and McDiarmid's behind-the-scenes control of the company, were concealed from investors and market professionals, giving the illusion of a *bona fide* company.  His signature appeared on numerous documents—consulting agreements, share deposit requests, brokerage account applications—bearing out these false appearances.  Since Ecogenics and Pompeii, which he owned and controlled, covertly funded IMMA's touting campaign, he fostered the false impression of independent market interest in the stock of a

company with no revenues or operations.  Telford personally directed the sales of millions of shares of IMMA's stock and transferred his $3.3 million gain offshore.  In short, Telford's undisputed conduct demonstrates "[a] pump-and-dump stock scheme [, which] is a classic violation of [the antifraud provisions of Section 10(b) and Section 17(a)]."  *SEC v. Curshen*, 888 F. Supp. 2d 1299, 1306 (S.D. Fl. 2012) (granting summary judgment against promoters engaged in "efforts to manipulate the stock of a fictitious company"); *see*, *e.g.*, *SEC v. Farmer*, No. 4:14-cv-2345, 2015 WL 5838867, at **15-16 (S.D. Tex. Oct. 7, 2015) (promoter's "undisclosed financing" of company's initial capitalization through straw purchasers was part of deceptive scheme "because it created the appearance of *bona fide* purchases," as did the promotional campaign defendant "coordinated and funded").

### c)   Telford made material misstatements

Section 10(b)/Rule 10b-5(b) makes it unlawful to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  15 U.S.C. § 78j(b).  *See* 17 C.F.R. § 240.10b-5(b); *SEC v. Platforms Wireless*, 617 F.3d at 1092.  Section 17(a)(2) makes it unlawful to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  15 U.S.C. § 77q(a)(2); *SEC v. GLT Dain Rauscher, Inc.*, 254 F.3d at 856.  The misstatements and omissions must concern material facts.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *TSC Indus., Inc. v. Northway*, 426 U.S. 438, 449 (1976).  A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision.  *See TSC Indus., Inc.*, 426 U.S. at 449; *SEC v. Platforms Wireless*, 617 F.2d at 1092.  Liability arises not only from affirmative representations but also from failures to disclose material information.  *SEC v. GLT Dain Rauscher*, 254 F.3d at 855-56.  The antifraud provisions impose "'a duty to

disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading.'" *SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (*quoting Hanon v. Dataproducts Corp*., 976 F.2d 497, 504 (9th Cir. 1992)). Anyone who "makes" a misleading statement or omission, or who has "ultimate authority over" it, can be liable under Rule 10b-5. *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).[10]

The undisputed evidence establishes that Telford himself made material misstatements in IMMA's public filings and to relevant market professionals. Before his recent Fifth Amendment assertion, he admitted to drafting, reviewing and commenting on portions of IMMA's SEC filings, including its Form S-1 and its periodic filings, as well as directing IMMA's auditors. The undisputed evidence further bears out Telford's authority over IMMA's SEC filings. He signed the account applications and share deposit forms that enabled IMMA's stock to be sold to the public. These documents misstated the roles of himself, McDiarmid and McCandless; the nominees' shareholdings and true affiliation with IMMA; and the identities of those providing IMMA's initial capitalization—including Amber and Sienna McCandless, twelve shareholders in the Philippines, and "lender" Morpheus. *See, e.g., SEC v. Farmer*, 2015 WL 5838876, at *12 (material misstatements to market maker to obtain FINRA clearance, designed "to conceal the nature and extent" of the promoter's involvement, actionable under Section 10b/Rule 10b-5); *SEC v. Poirier*, 140 F. Supp. 2d 1033, 1043 (D. Ariz. 2001) (promoters' "failing to disclose their control" of issuer was a material omission; summary judgment granted). Telford also plainly "obtained money" by means of his statements under

---

[10] Unlike liability under Section 10(b), *Janus* has no bearing on claims brought under Section 17(a) of the Securities Act. The "vast majority of courts dealing with the question of whether *Janus* also applies to claims under Section 17 have answered that question with a resounding 'no.'" *SEC v. Benger*, 931 F. Supp. 2d 904, 906 (N.D. Ill. 2013) (citing cases); *SEC v. Sells*, No. C 11-4941 CW, 2012 WL 3242551, at *7 (N.D. Cal. Aug. 10, 2012).

1    Section 17(a)(2)—to the tune of $3.3 million in the coffers of his nominees' accounts.

2                    **d)      Telford acted with scienter**

3          Telford's scheme to defraud and his material misstatements were carried out

4    with scienter (under Section 10(b)/Rule 10b-5, and Section 17(a)(1)) and with

5    negligence (under Section 17(a)(2), (a)(3)).  Telford was involved from the scheme's

6    inception, working with McDiarmid as early as 2011 to take IMMA public.  He

7    provided the auditors the falsified documentation of IMMA's capital structure

8    (including the Pompeii consulting agreement he signed), on which they relied for

9    audits of IMMA's S-1 and subsequent periodic reports.  He knew he falsely depicted

10   to the brokerage firms that allowed him to deposit IMMA's shares for trading his and

11   McDiarmid's roles and the nominees' true affiliations with IMMA.  His companies,

12   Ecogenics and Pompeii, secretly funded the touting of IMMA's stock, without

13   disclosing to the investors cold-called by Direct Info Share, or emailed by Think Ink

14   Marketing's investor relations blitz, that it was really selling insiders who were

15   behind the promotions.  Taking advantage of the spike in IMMA's stock from these

16   efforts, Telford, through entities of which he was the sole officer, director, and owner,

17   made over $3.3 million selling IMMA's stock to the unsuspecting public, and

18   pocketed the proceeds—before the promotion stopped and the stock price tanked.

19   Numerous courts have found similar evidence sufficient to find scienter as a matter of

20   law.  *See, e.g., SEC v. Poirier*, 142 F. Supp. 2d at 1033  (finding "sufficient evidence

21   about which reasonable minds could not differ" concerning promoters' undisclosed

22   control, since they "knew that they controlled every aspect of [penny stock issuer]

23   and still failed to indicate their control"); *SEC v. Farmer*, 2015 WL 5838876, at *11

24   (granting summary judgment, holding that, since defendant had "pocketed at least

25   $4.1 million of the proceeds" of stock sales in pump and dump, when company's

26   shares were being traded by "victims in the public market," the SEC had showed

27   "motive to commit securities fraud; and that the defendant's involvement for the

28   duration of the scheme "from its inception…until the worthless stock was dumped on

the public market over a year later" also supported inference of scienter); *SEC v. Gordon*, 822 F. Supp. 2d 1144, 1151-1152 (N.D. Okla. 2011) (granting summary judgment against defendant who made misrepresentations to transfer agent, and traded in nominee brokerage and bank accounts, to conceal his role as a promoter and in the marketing campaign for penny stock issuer).

### 2. Telford is liable for IMMA's Section 10(b)/Rule 10b/5 violations as its control person under Section 20(a)

In addition to his primary liability for violations of Section 10(b) and Rule 10b-5, Telford is also liable under Section 20(a) of the Exchange Act.  A person may be held liable for another person's violation of the Exchange Act under Section 20(a), as a "control person." 15 U.S.C. § 78t(a).  To establish control person liability, the SEC must demonstrate:  (1) a violation of the Exchange Act, and (2) that the control person directly or indirectly controlled the primary violator.  *SEC v. Todd*, 642 F.3d 1207, 1223-1224 (9th Cir. 2011); *Hollinger v. Titan Capital Corp*., 914 F.2d 1564, 1575 (9th Cir. 1990) (*en banc*) (holding it unnecessary to show "culpable participation" by control person).[11]

IMMA violated Section 10(b)/Rule 10b-5 by means of the fraudulent scheme and material misstatements carried out by Telford and McDiarmid.[12]  It was IMMA's public filings that concealed its promoters' roles as selling insiders and touters.  All of the deceptive acts carried out by Telford, as well as those by McDiarmid—the straw CEO, bogus capitalization, and hidden promotional campaign—are imputed to IMMA, for purposes of its scienter and negligence. *See, e.g., SEC v. Platforms*

---

[11] Exchange Act Rule 12b-2 defines control as the "power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2.

[12] IMMA's primary violation is one element of Telford's secondary liability. *See In re CitiSource, Inc. Sec. Litigation*, 694 F. Supp. 1069, 1077 (S.D.N.Y.1988) (holding that "liability of the primary violator is simply an element of proof of a section 20(a) claim," and that "liability need not be actually visited upon the primary violator before a controlling person may be held liable for the primary violator's wrong"); *see also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 285 (3d Cir. 2006).

17

*Wireless Int'l. Corp.*, 559 F. Supp. 2d 1091, 1096 (S.D. Cal. 2008), *aff'd.*, 617 F.3d 1072 (9th Cir. 2010), citing *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1089 n.3 (2d Cir. 1972).

Telford qualified as a control person of IMMA. Behind the scenes, he owned 9.9% of IMMA's stock. He directed its auditors and EDGAR agent as to the company's public filings, and signed documents relied on by its market maker that were submitted to FINRA so that IMMA's stock could trade. Considering that IMMA was a "development stage" company with no day-to-day operations or revenues, Telford's control of its SEC filings and share transfers—essentially its sole activities—was complete. *See, e.g., SEC v. Imperiali, Inc.*, No. 13–14809, Fed. Sec. L. Rep. P 98, 308, 594 Fed. Appx. 957, 962 (11th Cir. Dec. 2, 2014) (affirming summary judgment on Section 20(a) claim against "controlling shareholder [who] controlled corporate decisions" of issuer).

### B.    The Court Should Find that Telford Violated Section 5

The undisputed evidence further shows that Telford sold unregistered securities in violation of the registration requirements of Section 5 of the Securities Act, through his sales of IMMA stock on behalf of Ecogenics. These sales were not covered by IMMA's S-1 registration statement and no exemption from registration applied.

***Unregistered sales.*** Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) & 77e(c), prohibit the unregistered offer and sale of securities in interstate commerce. *Anderson v. Aurotek*, 774 F.2d 927, 929 (9th Cir. 1985); *Murphy*, 626 F.2d at 649. A Section 5 violation occurs when no registration statement was filed or in effect regarding the securities offered or sold. *SEC v. Platforms Wireless*, 617 F.3d 1072, 1085 (9th Cir. 2010); 17 U.S.C. §§ 77e(a) & (c). Section 5 is a strict liability statute. *See, e.g., SEC v. Alpha Telecom*, *Inc*., 187 F. Supp. 2d 1250, 1258 (D. Or. 2002). The SEC makes a *prima facie* case by showing: (1) defendants directly or indirectly sold or offered to sell securities through interstate commerce; and (2) no

1   registration statement was in effect as to the securities.  *SEC v. CMKM Diamonds,*
2   *Inc.*, 729 F.3d 1248, 1255 (9th Cir. 2013).  Once a *prima facie* violation is shown, the
3   defendant bears the burden of proving that an exemption applies.  *Murphy*, 626 F.2d
4   at 641 (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953)).

5       Because the registration requirement applies to *transactions*, not to individuals
6   or securities, each offer and sale of securities must comply with Section 5.  *See SEC
7   v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998).  A registration statement "permits an
8   issuer, or other person, to make ***only the offers and sales described in the***
9   ***registration statement***."  *Cavanagh*, 155 F.3d at 129 (emphasis added); Section 6(a)
10  of the Securities Act [15 U.S.C. § 77f(a)] (registration statement effective only as to
11  the securities specified "as proposed to be offered"); *see SEC v. Phan*, 500 F.3d 895,
12  905 (9th Cir. 2007) (registration statement did not cover certain offers and sales).

13      Telford's sales to the public of the IMMA stock that Ecogenics purported to
14  receive from Sienna McCandless pursuant to the 2013 consulting agreement were not
15  registered with the SEC.  Though IMMA's registration statement purported to
16  register for sale the shares belonging to Sienna McCandless, she never received any
17  shares, and therefore never transferred 500,00 shares to Ecogenics for sale.  Instead,
18  Ecogenics actually obtained the shares from Telford and McDiarmid.  No sales by
19  Telford, McDiarmid, or Ecogenics, however, were registered in the S-1.  Because
20  Telford executed the sales, he is liable under Section 5.

21      ***Absence of exemption.***  Nor does any exemption from registration apply.
22  Securities Act Section 4(a)(1) exempts from registration transactions "by any person
23  other than an issuer, underwriter, or dealer."  Section 2(a)(11) defines an underwriter
24  as "any person who has purchased from an issuer with a view to, or offers or sells for
25  an issuer in connection with, the distribution of any security, or participates or has a
26  direct or indirect participation in any such undertaking", and provides that an "issuer"
27  shall "include any person directly or indirectly controlling or controlled by the issuer,
28  or any person under direct or indirect common control with the issuer."  Based on

19

their control of IMMA, Telford and McDiarmid were both issuers of IMMA under this definition.  McDiarmid similarly controlled Sienna McCandless's activities regarding IMMA, making her also an issuer under Section 2(a)(11).  Because Ecogenics obtained its shares from Sienna McCandless (or more precisely, from Telford and McDiarmid) with a view to Telford's distribution of them, it was an underwriter, and the sales were non-exempt.  *See SEC v. Poirier*, 142 F. Supp. 2d at 1044 (D. Ariz. 2001) (granting summary judgment on Section 5 claim, finding that Section 4(2) exemption did not apply "when controlling shareholders sell the issuer's unregistered securities for the purpose of raising money for the company or themselves"); *SEC v. Reynolds*, No. 3:08-CV-0438-B, 2013 WL 3778830, at *3 (N.D. Tex. July 19, 2013) (granting summary judgment against promoters of pump and dump for unregistered offers and sales); *SEC v. Farmer*, 2015 WL 5838876, at *17 (granting summary judgment against promoter for unregistered offers and sales).

### C.  Telford's Fifth Amendment Assertions Further Support Liability

That Telford asserted the Fifth Amendment privilege as to every area of questioning at his deposition further establishes his securities law violations.  The consequences of Telford's assertions are twofold.  First, he should be precluded from offering any testimony to rebut the SEC's proof of his liability.  *See Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 911-12 (9th Cir. 2008); *SEC v. Benson*, 657 F. Supp. 1122, 1129 (S.D.N.Y. 1987).  "[I]t would be an abuse of the Fifth Amendment to allow a civil litigant to use it to offer proofs while denying the adversary discovery of his contentions."  *Benson*, 657 F. Supp. at 1129.  While he obviously has the right to assert the privilege, Telford "cannot have it both ways.  By hiding behind the protection of the Fifth Amendment as to his contentions, he gives up his right to prove them."  *Id.; see also Nationwide Life Ins.*, 541 F.3d at 910-11.

An order barring Telford from offering any evidence is more than justified.  Telford refused to answer the SEC's questions as to any aspect of the IMMA scheme— including his role or McDiarmid's—declining to answer anything  beyond his name and

address.  Under these circumstances, preclusion is more than warranted.  *See Nationwide Life Ins.*, 541 F.3d at 911-12; *Benson*, 657 F. Supp. at 1129-30 (barring testimony when defendant asserted Fifth Amendment privilege and was "uncooperative and obstructive"); *Curshen*, 888 F. Supp. 2d at 1307 (striking defendants' declarations from summary judgment record where defendants invoked Fifth Amendment during the discovery period "in response to questions relevant to the statutory violations"); *see also Bassett v. City of Burbank*, No. 2:14-cv-01348 SVW-CW, 2014 WL 12573395, at \*\*1-2 (C.D. Cal. Nov. 14, 2014) (precluding witnesses from testifying at trial concerning matters as to which she invoked her Fifth Amendment privilege at deposition).

Second, this Court may, and should, draw an adverse inference from Telford's repeated invocation of the Fifth Amendment.  It is well-established that "in civil proceedings, adverse inferences can be drawn from a party's invocation of [the] Fifth Amendment right" not to testify.  *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000); *see also SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998) ("Parties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from their failure of proof.").  To obtain the adverse inference, the SEC is required to show a substantial need for the information; that no other, less burdensome means of obtaining the information exists; that "the value of presenting [the] evidence" is not "substantially outweighed by the danger of unfair prejudice to the party asserting the privilege"; and that independent evidence of the fact about which the party refuses to testify exists.  *SEC v. Luna*, No. 2:10-CV-2166-PMP-CWH, 2014 WL 794202, at \*12 (D. Nev. Feb. 26, 2014) (quoting *Nationwide*, 541 F.3d at 911-12); *see also Glanzer*, 232 F.3d at 1264.

All of these criteria are present here.  Since McDiarmid has defaulted and his whereabouts are unknown, only Telford can offer first-person information about his conspiring with McDiarmid to operate IMMA and the nominees, all of which would be admissible admission testimony.  Moreover, the SEC has presented substantial, irrefutable and independent evidence against Telford that establishes his liability,

minimizing the potential prejudice to Telford from an adverse inference.  *See Luna*, 2014 WL 794202, at *12 (drawing adverse inference against defendant when SEC presented "independent evidence" and testimony "would have constituted admissible evidence"); *Curtin v. City of Orange*, No. 8:16-CV-00591-SVW-PLA (2017 U.S. Dist. LEXIS 216938, at *3 (C.D. Cal. Aug. 1, 2017) (adverse inference "would be appropriate" where defendant invoked Fifth Amendment at deposition; there was a "substantial need to know what transpired" between he and the plaintiff, and there was no "'less burdensome way' to obtain the information than from asking [defendant] his version of events…"); *SEC v. Prime One Partners, Corp.*, No. CV-94-3322 SVW(GHKx), 1995 U.S. Dist. LEXIS 22587, at *14 (C.D. Cal. June 14, 1995) (SEC entitled to adverse inference where defendants asserted Fifth Amendment privilege; summary judgment granted); *SEC v. Lauer*, No. 03-80612-CIV, 2008 WL 4372896, *23 (S.D. Fla. Sept. 24, 2008) (same).  Therefore, the Court should draw an adverse inference against Telford as to each of the topics he refused to address, providing additional grounds to grant the SEC's motion.

### D.     The Court Should Impose Injunctive and Monetary Relief

*Injunctive relief.* Securities Act Section 20(b), 15 U.S.C. § 77t(b), and Exchange Act Section 21(d), 15 U.S.C. § 78u(d), provide that when the evidence establishes a reasonable likelihood of a future violation of the securities laws, a permanent injunction shall be granted in enforcement actions brought by the SEC. *SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980); *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692 (9th Cir. 1978); *SEC v. Fehn*, 97 F.3d at 1295-96.  Factors include the degree of scienter involved; the isolated or recurrent nature of the infractions; the defendant's recognition of the wrongful nature of his conduct; the likelihood that, based on the defendant's occupation, future violations might occur; and the sincerity of the defendant's assurances against future violations.

Here, the totality of the circumstances weighs in favor of a permanent injunction.  Telford acted with a high degree of scienter, over a lengthy scheme to

1  defraud, with wide-ranging acts of deception.  His involvement in SEC public

2  company filings extends widely beyond IMMA, as does his affiliation with his co-

3  conspirator McDiarmid.  He has offered no assurances against future violations nor

4  any recognition of the wrongful nature of his conduct.  Therefore, an injunction

5  should issue.  *Se, e.g., SEC v. Jammin Java Corp.*, No. 2:15-cv-08921 SVW(MRWx),

6  2017 WL 4286180, at *1 (C.D. Cal. Sept. 14, 2017) (imposing permanent injunction

7  against promoter of pump and dump including based on 17-month duration of scheme

8  and prompter's "numerous, repeated act of deception…"); *SEC v. Gordon*, 822 F.

9  Supp. at 1162 (permanently enjoining promoter of penny stock pump and dump

10 whose actions "caused millions of dollars of investor losses").

11     ***Disgorgement.***  It is well settled that the SEC may seek, and courts may order,

12 disgorgement of ill-gotten gains.  *See SEC v. First Pacific Bancorp*, 142 F.3d at

13 1191(courts have "broad equity powers to order the disgorgement of 'ill-gotten gains'

14 obtained through the violation of the securities laws"); *SEC v. Patel*, 61 F.3d 137, 139

15 (2d Cir. 1995); *see also SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1113 (9th

16 Cir. 2006).  Disgorgement typically includes prejudgment interest, to ensure that the

17 wrongdoer does not profit from the illegal activity.  *See SEC v. Manor Nursing*

18 *Centers, Inc.*, 458 F.2d at 1105; *SEC v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d

19 1185, 1190 (D. Nev. 2009); *Cross Financial Services*, 908 F. Supp. at 734.  "[W]here

20 two or more individuals or entities collaborate or have a close relationship in

21 engaging in the violations of the securities laws," joint and several disgorgement is

22 appropriate.  *SEC v. Poirier*, 142 F. Supp. at 1047-48 (ordering joint and several

23 disgorgement against promoters of pump and dump scheme for all illegally obtained

24 proceeds, noting that  joint and several liability is appropriate).

25     Telford should be ordered to disgorge, jointly and severally with McDiarmid,

26 the total net trading proceeds from the sale of IMMA's stock, or $3,316,235.48.  SF ¶

27 225.  The SEC has presented evidence demonstrating that this amount is a

28 "reasonable approximation" of Telford's ill-gotten gains.  Telford should also pay

prejudgment interest on the disgorgement amount.  Prejudgment interest on $$3,316,235.48 from October 30, 2014 through September 30, 2017, is $302,781.91. *Id*.  These are the appropriate measures of disgorgement (and prejudgment interest) for Telford's violations.  *See, e.g., Jammin Java*, 2017 WL 4286180, at \*4 (ordering disgorgement of "all profits retained by [promoter of pump and dump] or entities he controlled," with prejudgment interest).

    ***Civil Penalty.*** Telford should also be assessed penalties under Securities Act Section 20(d)(1) and Exchange Act Section 21(d)(3)(A).  15 U.S.C. §§ 77t(d)(1), 78u(d)(3)(A).  Civil penalties are meant to punish wrongdoers and to deter them and others from future securities law violations.  *See Kenton Capital*, 69 F. Supp. 2d at 17.  The amount of any civil penalty "shall be determined by the court in light of the facts and circumstances."  15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B).  Because civil penalties, like permanent injunctions, are imposed to deter the wrongdoer from similar conduct in the future, in assessing civil penalties, courts frequently apply the factors set forth in *SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980), used to establish the need for injunctive relief.  Third-tier penalties apply to violations that (i) involve "fraud, deceit, manipulation, or reckless disregard of a regulatory requirement" and (ii) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  *Id*. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).  A penalty cannot exceed the greater of either a specific statutory amount, or "the gross amount of pecuniary gain to such defendant as the result of the violation."  *Id*. §§ 77t(d)(2), 78u(d)(3)(B).  Courts often award the amount of the disgorgement as the defendant's pecuniary gain.  *See, e.g.*, *Jammin Java*, 2017 WL 4286180, at \*5  (third tier civil penalty equal to the amount of disgorgement against promoter of pump and dump scheme).  The SEC proposes a third tier civil monetary penalty against Telford of $1,644,766, representing approximately half the pecuniary gain of the co-conspirators' scheme, apportioned equally between them (and the same penalty it has proposed against McDiarmid (*see* Dkt. No. 57-2 at 6)).

***Permanent bars.***  Telford should also be barred from serving as a public company officer or director, and from participating in penny stock offerings. Securities Act Sections 20(e) and (g) and Exchange Act Sections 21(d)(2) and (d)(5) authorize the SEC to seek these bars against defendants who violate the antifraud provisions.  15 U.S.C. § 77t(e), (g); 15 U.S.C. § 78u(d)(2), (5).  The Court "has broad equitable powers to fashion appropriate relief for violations of the federal securities laws, which include the power to order an officer and director bar."  *SEC v. First Pacific Bancorp*, 142 F.3d at 1193.  "When deciding to impose [a penny stock] bar, the court looks at essentially the same factors that govern the imposition of an officer or director bar," (*Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir.1979), including (1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur.  The same violations that warrant the imposition of an injunction against Telford favor this additional equitable relief.  *See, e.g., Jammin Java.*, 2017 WL 4286180, at *2 (imposing penny stock bar against promoter of pump and dump scheme involving penny stock).

## IV.  <u>CONCLUSION</u>

Based on the foregoing, the SEC respectfully requests that the Court grant summary judgment and award injunctive and monetary relief against Telford.

Dated:  August 13, 2018

Respectfully submitted,

*/s/ Amy Jane Longo*
Amy Jane Longo
Donald W. Searles
Roberto A. Tercero
Attorneys for Plaintiff
Securities and Exchange Commission

## <u>PROOF OF SERVICE</u>

I am over the age of 18 years and not a party to this action.  My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
444 S. Flower Street, Suite 900, Los Angeles, California 90071
Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On August 13, 2018, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT KENNETH TELFORD** on all the parties to this action addressed as stated on the attached service list:

☐    **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐    **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐    **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐    **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐    **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☒    **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☐    **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐    **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  August 13, 2018              */s/ Amy Jane Longo*
                                                    Amy Jane Longo

*SEC v. Jason McDiarmid, et al.*
**United States District Court—Central District of California**
**Case No. 2:17-CV-07201-SVW-FFM**

## SERVICE LIST

Kenneth Telford
kgc.telford@gmail.com
(by email only)