AMY JANE LONGO, Cal. Bar. No. 198304
Email:  longoa@sec.gov
DONALD W. SEARLES, Cal. Bar. No. 135705
Email;  searlesd@sec.gov
ROBERTO A. TERCERO, Cal. Bar No. 143760
Email:  terceror@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka Patel, Associate Regional Director
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>JASON McDIARMID, KENNETH TELFORD and INTERACTIVE MULTI-MEDIA AUCTION CORP. (aka STOP SLEEP GO INC.)<br><br>Defendants. | Case No.  2:17-CV-07201-SVW-FFM<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT KENNETH TELFORD**<br><br>Date:      September 17, 2018<br>Time:      1:30 p.m.<br>Ctrm:      10A<br>Judge:    Hon. Stephen V. Wilson |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................ 1

II.   STATEMENT OF UNCONTROVERTED FACTS ............................. 1

      A.    IMMA's Creation, Straw CEO and Initial Capitalization .......................... 8

      B.    False or Misleading Statements in IMMA's S-1s ..................................... 16

      C.    False or Misleading Statements in IMMA's Form 211 Process and in
            the Deposit of IMMA's Shares with the Brokerages ................................ 25

      D.    False or Misleading Statements in IMMA's Periodic Filings .................. 36

      E.    Defendants' Promotional Campaign for IMMA's stock .......................... 38

      F.    Telford's Stock Sales and Disposition of Proceeds ................................. 43

      G.    Attempted Witness Tampering ................................................................. 47

      H.    Telford's Refusal to Testify Based on Fifth Amendment Privilege ......... 48

III.  CONCLUSIONS OF LAW ............................................................... 53

i

## I.     INTRODUCTION

Under Local Rule 56-1 of the U.S. Central District, plaintiff Securities and Exchange Commission ("SEC") submits this Statement of Uncontroverted Facts and Conclusions of Law in support of its motion for summary judgment against defendant Kenneth Telford ("Telford").

## II.     STATEMENT OF UNCONTROVERTED FACTS

| Uncontroverted Fact | Evidence |
|---|---|
| *Telford's Background* | |
| 1.     Telford is a Canadian citizen residing in the Philippines. | Declaration of Amy Jane Longo filed concurrently herewith ("Longo Decl.") Ex. 8 [Deposition of Kenneth Telford, July 17, 2018 ("Telford Depo.") 10:15-17] <br><br> Longo Decl. Ex. 73 at SEC-SCHWAB-E-0000133 |
| 2.     Telford has been licensed as a certified public accountant in the State of Washington since 1996. | Longo Decl. Ex. 114; Ex. 107 at 21, 28 |
| 3.     Telford is a member of the Chartered Professional Accountant of British Columbia. | Longo Decl. Ex 115; 107 at 21, 28 |
| 4.     Telford and McDiarmid hold Telford out as a former partner with Deloitte & Touche. | Longo Decl. Exs. 53; 107 at 21, 28 <br><br> Longo Decl. Ex. 6 [Investigative Testimony of |

| Uncontroverted Fact | Evidence |
|---|---|
|  | Chang Park, October 13, 2016 ("Park") 37:14-38:3] |
| 5.     Telford has served as the chief financial officer of several public companies: (1) Revonergy, Inc.; (2) MobiClear, Inc.; (3) Essential Innovations Technology Corp. ("ESIV"); and (4) Brek Energy Corp. | Longo Decl. Exs. 107 at 28; 108 at 21; 109 at 2; 110 at 26 |
| 6.     In addition to working together on Interactive Multi-Media Auction Corp. ("IMMA"), Telford and McDiarmid worked together on ESIV, where McDiarmid was the president and Telford was the CFO. | Longo Decl. Ex. 106 at 2; Ex. 49<br><br>Longo Decl. Ex. 10 [Investigative Testimony of Martin Weigel, Sept. 25, 2016 ("Weigel") 131:3-18] |
| 7.     ESIV was also a penny stock development stage issuer with no revenues, located at 3rd floor, Shun Feng International Center, Queens Road, East Hong Kong. | Longo Decl. Ex. 106 at 1, 6, 9 |
| 8.     Telford describes McDiarmid as a "friend." | Longo Decl. Ex. 29; Ex. 80 at SEC-FINRA-E-0000902-905<br><br>Longo Decl. Ex. 2 [Deposition Testimony of Mackey MacFarlane Alligood, July 2, 2018 "Alligood Depo") 18:10-17] |

| Uncontroverted Fact | Evidence |
|---|---|
| 9.      McDiarmid told IMMA's first outside auditor, Ingenium Accounting Associates, that he and Telford "maintain a close working relationship" and that Telford "assist[s him] with accounting/auditing communications…" | Longo Decl. Ex. 49<br><br>Longo Decl. Ex. 10 [Weigel 131:3-18] |
| 10.     IMMA's first auditor understood that McDiarmid and Telford had "worked for a long time" together. | Longo Decl. Ex. 10 [Weigel 37:3-16] |
| 11.     During the relevant time period, Telford used the following email addresses:<br>• Ken.telford@denoncapital.com<br>• Kgc.telford@gmail.com | Longo Decl. Exs. 29; 73<br><br>Longo Decl. Ex. 2 [Alligood Depo 18:10-17] |
| 12.     During the relevant time period, McDiarmid used the following email addresses:<br>• phantasmvisionary@yahoo.com<br>• pubcoconsultingservices@yahoo.ca<br>• christyfabros@hotmail.com<br>• asiaspecialist@hushmail.com | Longo Decl. Exs. 12; 15; 23; 116<br><br>Longo Decl. Exs. 7; 5; 4; 3 [Investigative Testimony of Claire Stevens, March 1, 2016 ("Stevens") 26:5-23, 29:7-13; Investigative Testimony of Leticia Meza, Nov. 20, 2016 "Meza") 22:16-23:14; Investigative Testimony of Sienna McCandless, December 11, 2015 ("Sienna McCandless") 18:11-22; |

| Uncontroverted Fact | Evidence |
| --- | --- |
| | Investigative Testimony of Amber McCandless, December 1, 2016 ("Amber McCandless") 46:2-47:10] |
| 13.    Telford and his wife Maribel Fernandez Telford are the signatories on a joint bank account at Chinatrust Bank Account ("CTBC") in the Philippines, with an account number ending in X270-2. | Declaration of Christopher Conte filed concurrently herewith ("Conte Decl.") ¶¶ 25-26, Exs. 23-24 |
| *Denon Capital Strategies Ltd. ("Denon")* | |
| 14.    Denon was incorporated in the British Virgin Islands in July 2005. | Longo Decl. Ex. 73 at SEC-SCHWAB-E-0000147 |
| 15.    Telford is the principal of Denon. | Dkt. No. 9 ("Telford Answer") ¶ 11 |
| 16.    Denon's principal place of business is in Hong Kong, 3rd floor, Shun Feng International Center, Queens Road, East Hong Kong. | Longo Decl. Ex. 30 at SEC-MA-E-0000098  Longo Decl. Ex. 1 [Investigative Testimony of Mackey MacFarlane Alligood, August 22, 2016 ("Alligood Investigative") 39:12-20] |
| 17.    Telford is the sole director of Denon. | Longo Decl. Ex. 73 at SEC-SCHWAB-E-0000128 |
| 18.    Telford is the president of Denon. | Longo Decl. Ex. 73 at SEC-SCHWAB-E-0000142 |

| Uncontroverted Fact | Evidence |
|---|---|
| 19. Telford owns 100% of Denon. | Longo Decl. Ex. 117 at SEC-FINRA-E-0000904 |
| 20. Telford opened Denon's Schwab account ending in -0166 on or about November 24, 2005. | Longo Decl. Ex. 73 at SEC-SCHWAB-E-0000127 |
| 21. Between September 29, 2014 and May 29, 2015, Denon purchased approximately 630,000 shares of IMMA in the open market for $747,677.60. | Conte Decl. ¶ 22, Ex. 19 |
| 22. Denon has a bank account at HSBC in Hong Kong ending in -7838. | Longo Decl. Ex. 74 |
| 23. Telford is the signatory on Denon's HSBC account. | Longo Decl. Ex. 74 at SECPHL-E-00000085, 109 |
| ***Pompeii Finance Corp. ("Pompeii")*** | |
| 24. Pompeii was incorporated in the British Virgin Islands on March 31, 2009. | Longo Decl. Ex. 30 at SEC-MA-E-00000106 Longo Decl. Ex. 1 [Alligood Investigative 39:12-20] |
| 25. Pompeii has its principal place of business in Hong Kong, at the same business address as Denon, 3rd floor, Shun Feng International Center, Queens Road, East Hong Kong. | Longo Decl. Ex. 30 at SEC-MA-E-0000098 Longo Decl. Ex. 1 [Alligood Investigative 39:12-20] |
| 26. As of December 2013, Telford was the sole officer and director of Pompeii. | Telford Answer ¶ 11 Longo Decl. Ex. 29 at SEC- |

| Uncontroverted Fact | Evidence |
|---|---|
|  | FINRA-E-00006812, Ex. 30 at SEC-MA-E-00000102 |
|  | Longo Decl. Exs. 2; 1 [Alligood Depo 18:10-17; Alligood Investigative 39:12-20] |
| 27.  As a director of Pompeii and Ecogenics, Telford signed forms to open brokerage accounts into which IMMA shares were deposited. | Telford Answer ¶ 6 |
| 28.  Telford and Denon were the joint account applicants for Pompeii's brokerage account at Meyers Associates ("Meyers"), which Telford signed on January 6, 2014 as the sole director and officer. | Longo Decl. Ex. 30 at SEC-MA-E-0000098 Longo Decl. Ex. 2 [Alligood Depo 26:23-27:4] |
| 29.  In January 2014, Telford provided McDiarmid the information needed to open the Pompeii brokerage account at Meyers, and asked him to submit it. | Longo Decl. Ex. 29 Longo Decl. Ex. 2; 1 [Alligood Depo 18:10-17; Alligood Investigative 20:5-21] |
| 30.  According to IMMA's S-1s, Telford had voting and dispositive control over Pompeii's shares of IMMA. | Longo Decl. Ex. 13 at 18 |
| 31.  Pompeii has a bank account at HSBC in Hong Kong ending in -1838. | Longo Decl. Ex. 76 |
| 32.  Telford was the signatory on Pompeii's | Longo Decl. Ex. 76 at 33 |

| Uncontroverted Fact | Evidence |
|---|---|
| HSBC account. | |
| **_Ecogenics Ltd._** | |
| 33.    Ecogenics was incorporated in Hong Kong in 2002. | Longo Decl. Ex. 75 |
| 34.    Telford was a director of Ecogenics. | Telford Answer ¶ 6 |
| 35.    Ecogenics has its principal place of business in Hong Kong, at the same business address as Denon:  3rd floor, Shun Feng International Center, Queens Road, East Hong Kong. | Longo Decl. Ex. 79 at SEC-FINRA-E-0008782 |
| 36.    Pompeii was appointed director of Ecogenics on May 5, 2012. | Longo Decl. Ex. 81 at SEC-SECPHL-E-0000026 |
| 37.    Telford was the sole officer of Ecogenics as of November 2013. | Longo Decl. Ex. 79 at SEC-FINRA-E-0008792 |
| 38.    As of December 2014, Telford represented to Glendale Securities that he owned Pompeii, which in turn owned Ecogenics, making him the beneficial owner of both entities. | Longo Decl. Ex. 78 |
| 39.    As a director of Pompeii and Ecogenics, Telford signed forms to open brokerage accounts into which IMMA shares were deposited. | Telford Answer ¶ 6 |
| 40.    Ecogenics has a bank account at HSBC in Hong Kong ending in -5838. | Longo Decl. Ex. 81 at SEC-SECPHL-E-000003 |
| 41.    As of May 5, 2012, Telford was authorized to act on behalf of Pompeii as a director of Ecogenics regarding the HSBC account. | Longo Decl. Ex. 81 at SEC-SECPHL-E-0000027 |

7

| Uncontroverted Fact | Evidence |
|---|---|
| 42.   Telford opened Ecogenics' brokerage account with Glendale Securities (ending -4648) in November 2013. | Longo Decl. Ex. 79 at SEC-FINRA-E-0008792 |
| 43.   Telford opened Ecogenics' brokerage account with Glendale Securities (ending -8ELGD) in January 2014. | Longo Decl. Ex. 80 at SEC-FINRA-E-0005326 |
| *Morpheus Financial Corp.* | |
| 44.   As of 2015, Morpheus had the same business address as ESIV, Denon, Pompeii and Ecogenics in Hong Kong. | Longo Decl. Ex. 84  at SEC-PLSCPA-E-0004000 |

### A.   IMMA's Creation, Straw CEO and Initial Capitalization

| *Telford's Role in IMMA's Formation* | |
|---|---|
| **Uncontroverted Fact** | **Evidence** |
| 45.   In or around 2008, McDiarmid suggested to Amber McCandless that he could take her defunct art-based television program, Art Showcase Auction, and turn it into a public company and online art auction. | Longo Decl. Ex. 3 [Amber McCandless 23:21-24:2, 32:7-15-33:15] |
| 46.   McDiarmid came up with the name IMMA. | Longo Decl. Ex. 3 [Amber McCandless 50:17-52:20]

Longo Decl. Ex. 58 |
| 47.   IMMA was incorporated on July 13, 2012 in the British Virgin Islands. | Longo Decl. Ex. 13 at 5 |
| 48.   McDiarmid never told McCandless what | Longo Decl. Ex. 3 [Amber |

| | |
|---|---|
| her duties would be as the sole officer and director of IMMA; she thought she would be providing her "art knowledge." | McCandless 52:24-53:3, 70:5-15] |
| 49.     Telford directed McDiarmid to obtain from Amber McCandless and send to Telford a backup of IMMA's financial records in QuickBooks in April 2011, over a year before its incorporation in 2012. | Longo Decl. Ex. 116  Longo Decl. Ex. 3 [Amber McCandless 46:3-17] |
| 50.     Amber McCandless never met or spoke to Telford, nor did she know that he played any role in the formation of IMMA. | Longo Decl. Ex. 3 [Amber McCandless 48:9-49:5] |
| ***Private Placements*** | |
| 51.     IMMA's S-1 references 250,000 shares of common stock purportedly issued through a private placement offering. | Longo Decl. Ex. 13 at 17, 65, 67-69 |
| 52.     According to a "Letter of Verification of Receipt of Funds Collected for Share Subscriptions by Outside Company Consultant" dated November 14, 2012, purporting to bear the electronic signature "/JASONMCDIARMID/", McDiarmid obtained $15,000 from twelve shareholders via subscription agreements for IMMA shares in September and October 2012. | Longo Decl. Ex. 24 at SEC-GS-E25014  Longo Decl. Ex. 5 [Meza 30:4-31:20] |
| 53.     The subscription agreements purport to bear the electronic signatures of "/AMBERMCCANDLESS/Authorized Officer" and each respective "shareholder", and reflect | Longo Decl. Ex. 47  Longo Decl. Ex. 10 [Weigel 77:3-78:5] |

| | |
|---|---|
| signature dates of either September 15, 2012 or October 15, 2012, purporting to sell 250,000 shares of IMMA common stock in increments of 20,000 and 30,000 shares, at prices of either $.05 or $.1 per share. | Longo Decl. Ex. 86 |
| 54.   Amber McCandless was not informed by McDiarmid that he was looking for investors in the Philippines or that he had obtained investors. | Longo Decl. Ex. 3 [Amber McCandless 69:3-20] |
| 55.   Amber McCandless never saw the subscription agreements. | Longo Decl. Ex. 3 [Amber McCandless 72:16-75:16] |
| 56.   Amber McCandless did not sign the subscription agreements nor authorize her signature to be used on them. | Longo Decl. Ex. 3 [Amber McCandless 72:16-75:16] |
| 57.   In fall 2012, Telford provided the subscription agreements for the private placements to Weigel for Ingenium's audit engagement with respect to IMMA's S-1. | Longo Decl. Ex. 86<br><br>Declaration of Martin Weigel filed concurrently herewith ("Weigel Decl.") ¶¶ 12-13 |
| ***Founders' shares and loan agreement*** | |
| 58.   IMMA's S-1 references shares purportedly issued to Morpheus and to Amber McCandless. | Longo Decl. Ex. 13 at 64, 65, 67-69] |
| 59.   According to an undated "Record of Receipt of Funds Borrowed From Morpheus Financial," purporting to bear the electronic signature "/AMBERMCCANDLESS/ President" of IMMA, IMMA received $7,500 CAD under a loan agreement with Morpheus dated October 15, | Weigel Decl. ¶ 11<br><br>Longo Decl. Ex. 87 at KT_SEC_000573; Ex. 45 |

| | |
|---|---|
| 2012. | |
| 60.     A "Loan Agreement" between Morpheus and IMMA, purportedly executed on July 13, 2012 and electronically signed by "/AM/ President" for IMMA and by "/MC/ Managing Director" for Morpheus, provided for a loan of up to $15,000 CAD. | Weigel Decl. ¶ 10<br><br>Longo Decl. Ex. 87 at KT_SEC_000571; Ex. 45 |
| 61.     According to an undated "Formal Verification Record of Receipt of Funds in Payment of Issuance of Founders Shares," purportedly signed by "/AMBERMCCANDLESS/ President," IMMA received the following payments for founders' shares:<br><br>• 7/13/12 - $2,000.00 from Amber McCandless for 2 million shares<br>• 7/13/12 - $2,225.00 from Amber McCandless for 2.225 million shares<br>• 7/15/12 - $2,000.00 from Morpheus for 2 million shares | Weigel Decl. ¶ 11<br><br>Longo Decl. Ex. 87 at KT_SEC_000570<br><br>Longo Decl. Ex. 46 |
| 62.     According to a "Disbursement Record of Initial Funds Received From Investment in Company Founders Shares" dated September 1, 2012 and purportedly signed by "/AMBERMCCANDLESS/ President," IMMA, from the $6,225.00 received for its founders shares, disbursed to Amber McCandless for | Longo Decl. Ex. 44<br><br>Longo Decl. Ex. 10 [Weigel 59:13-60:11] |

| | |
|---|---|
| "management fees" $2,750.00 and to an unidentified recipient $1,250.00 for "consulting fees." | |
| 63. Amber McCandless did not purchase or receive any IMMA shares. | Longo Decl. Ex. 3 [Amber McCandless 54:1-8, 54:19-56:19, 58:14-60:4]<br><br>Longo Decl. Exs. 44; 46 |
| 64. Amber McCandless did not receive any money for the purchase of IMMA shares. | Longo Decl. Ex. 3 [Amber McCandless 54:19-56:19, 58:14-60:4]<br><br>Longo Decl. Exs. 44; 46 |
| 65. Amber McCandless did not sign the Disbursement Record (Ex. 102) or authorize anyone to sign for her. | Longo Decl. Ex. 3 [Amber McCandless 54:19-56:19, 58:14-60:4]<br><br>Longo Decl. Exs. 44; 46 |
| 66. Amber McCandless did not authorize the payment of any consulting fees for IMMA. | Longo Decl. Ex. 3 [Amber McCandless 54:19-56:19, 58:14-60:4]<br><br>Longo Decl. Exs. 44; 46 |
| 67. Amber McCandless was not aware of any loan from Morpheus. | Longo Decl. Ex. 3 [Amber McCandless 57:5-58:11]<br><br>Longo Decl. Ex. 45 |

| 68. Amber McCandless did not sign the loan agreement (Ex. 104) or authorize anyone to sign for her. | Longo Decl. Ex. 3 [Amber McCandless 57:5-58:11]<br><br>Longo Decl. Ex. 45 |
|---|---|
| 69. Amber McCandless did not sign the "Verification Record" (Ex. 106) or authorize anyone to sign for her. | Longo Decl. Ex. 3 [Amber McCandless 58:14-60:4]<br><br>Longo Decl. Ex. 46 |
| 70. Amber McCandless did not receive $2,000 for 2 million shares from Morpheus. | Longo Decl. Ex. 3 [Amber McCandless 58:14-60:4]<br><br>Longo Decl. Ex. 46 |
| 71. In fall 2012, Telford provided the documentation associated with the founders shares and Morpheus loan to Weigel for Ingenium's audit engagement with respect to IMMA's S-1. | Longo Decl. Exs. 44-46, 87<br><br>Weigel Decl. ¶¶ 9-11 |
| ***Initial Consulting Agreements*** | |
| 72. IMMA's S-1 references consulting agreements pursuant to which shares of IMMA common stock were purportedly issued in September and October 2012. | Longo Decl. Ex. 13 at 65, 67-69] |
| 73. Of the six agreements: one was with Sienna McCandless, the sister of the CEO (1,00,000 shares); one was with Telford's wife Maribel Fernandez (for 750,000 shares); one was with Ecogenics (for 275,000 shares); one was | Longo Decl. Ex. 27 at F_000434-486; Ex. 88<br><br>Longo Decl. Ex. 5 [Meza 63:10-65:2] |

| | |
|---|---|
| with Best Peak Holdings, principal Monica Chu, who was also the principal of Morpheus (1,125,000 shares); and one was with Pompeii (for 825,000 shares). | Weigel Decl. ¶ 14<br><br>Conte Decl. ¶¶ 25-26, Exs. 23-24 |
| 74.    Telford signed Pompeii's consulting agreement with IMMA on Pompeii's behalf. | Longo Decl. Ex. 24 at SEC-GS-E-0025080 |
| 75.    Though they each purport to bear her handwritten signature, Amber McCandless did not sign any of the consulting agreements. | Longo Decl. Ex. 3 [Amber McCandless 75:17-78:25]<br><br>Longo Decl. Ex. 24<br><br>Longo Decl. Ex. 5 [Meza 30:4-31:20] |
| 76.    As of 2016, Amber McCandless had never heard of Pompeii or Ecogenics. | Longo Decl. Ex. 3 [Amber McCandless 75:17-78:25] |
| 77.    Sienna McCandless did not agree to provide consulting services to IMMA in exchange for IMMA shares. | Longo Decl. Ex. 4 [Sienna McCandless 45:13-24, 46:10-17]; Ex. 5 [Meza 30:4-31:20]<br><br>Longo Decl. Ex. 26; Ex. 119 at F_000442-450 |
| 78.    Sienna McCandless did not receive one million IMMA shares, or any IMMA shares at all. | Longo Decl. Ex. 4 [Sienna McCandless 45:13-24, 46:10- |

| | |
|---|---|
| | 17]; Ex. 5 [Meza 30:4-31:20] Longo Decl. Ex. 26; Ex. 119 at F_000442-450 |
| 79.   Sienna McCandless never received $50K from Ecogenics for consulting, nor any money, nor provided any services. | Longo Decl. Ex. 4 [Sienna McCandless 49:9-15] |
| 80.   In fall 2012, Telford provided the initial consulting agreements to Weigel for Ingenium's audit engagement with respect to IMMA's S-1. | Longo Decl. Ex. 88 Weigel Decl. ¶¶ 9-11 |
| **Fall 2013 Sienna McCandless-Ecogenics consulting agreement** | |
| 81.   On November 21, 2013, McDiarmid had Amber McCandless execute, without explanation or discussion, a Company Representation Letter as to the transfer of 500,000 shares from Sienna McCandless to Ecogenics, pursuant to a consulting agreement between Sienna McCandless and Ecogenics, stating that Ecogenics is "not an affiliate of the company" and has not been for the past 90 days. | Longo Decl. Ex. 62 Longo Decl. Ex. 3 [Amber McCandless 134:23-135:3, 137:2-25] |
| 82.   Telford signed Ecogenics' consulting agreement with Sienna McCandless on the company's behalf. | Longo Decl. Ex. 12 at 242 |
| 83.   On December 9, 2013, McDiarmid, through Amber McCandless, had Sienna | Longo Decl. Ex. 63 |

| | |
|---|---|
| McCandless execute the share transfer agreement and send it to Issuer Direct, without explanation or discussion. | Longo Decl. Ex. 3 [Amber McCandless 138:2-25] |
| 84.      On January 20, 2014, McDiarmid had Sienna McCandless execute the stock power certificate. | Longo Decl. Ex. 14<br><br>Longo Decl. Ex. 4 [Sienna McCandless 55:16-56:7, 57:15-58:8, 59:25-60:15] |
| 85.      Sienna McCandless did not know what the documents were. | Longo Decl. Ex. 14<br><br>Longo Decl. Ex. 4 [Sienna McCandless 55:16-56:7, 57:15-58:8, 59:25-60:15] |
| 86.      Though she signed the share transfer and stock power at McDiarmid's direction, Sienna McCandless had not heard of Ecogenics before receiving the SEC subpoena. | Longo Decl. Ex. 14<br><br>Longo Decl. Ex. 4 [Sienna McCandless 58:18-59:18, 59:25-60:15, 63:25-64:3] |

**B.      False or Misleading Statements in IMMA's S-1s**

| Uncontroverted Fact | Evidence |
|---|---|
| *Telford's Role in IMMA's Public Filings* | |
| 87.      In October 2012, McDiarmid retained Ingenium to audit IMMA's balance sheet from the period of its inception to the balance sheet date to be included in IMMA's S-1 registration statement, and its related statements of | Weigel Decl. ¶ 2<br><br>Longo Decl. Ex. 10 [Weigel 21:24-22:8]; Ex. 56 [Investigative Testimony of |

| Uncontroverted Fact | Evidence |
|---|---|
| operations, comprehensive income, stockholders' equity and cash flow.  Martin Weigel and Alan Goldman worked on the IMMA account. | Alan Goldman, September 16, 2016 ("Goldman") 19:17-22] |
| 88.    The objective of the audit of IMMA's financial statements was for Ingenium to be able to express an opinion that IMMA's  financial statements were in accordance with Generally Accepted Accounting Principles ("GAAP"), and to include an audit opinion letter in IMMA's S-1 and annual  filings with the SEC (Forms 10-K). | Weigel Decl. ¶ 2 |
| 89.    Telford provided the IMMA QuickBooks accounting records to Weigel in November 2012. | Longo Decl. Ex. 10 [Weigel 41:12-42:18]

Longo Decl. Ex. 43 |
| 90.    Based on communications with Telford, Ingenium understood that Telford was IMMA's bookkeeper, prepared IMMA's financial statements, assisted in the drafting of IMMA's S-1 registration statement and Forms 10-K and 10-Q, and through his beneficial ownership of IMMA shares through his companies Ecogenics and Pompeii, was an IMMA investor and shareholder. | Weigel Decl. ¶ 7

Longo Decl. Ex. 10 [Weigel 32:3-32:25] |
| 91.    Telford commented on drafts of IMMA's Form S-1 registration statement filed with the SEC ("S-1"). | Telford Answer ¶ 38 |

| Uncontroverted Fact | Evidence |
|---|---|
| 92.      Telford was "in contact with the auditor" after the S-1 was filed. | Telford Answer ¶ 40 |
| 93.      Telford "typically prepared IMMA's financial statements." | Telford Answer ¶ 54 |
| 94.      Telford "prepared certain portions of IMMA's periodic filings." | Telford Answer ¶ 6 |
| 95.      Goldman considered McDiarmid and Telford the primary contacts for the IMMA audits by Ingenium. | Longo Decl. Ex.56 [Goldman 26-27:3] |
| 96.      Issuer Direct Corp. served as IMMA's EDGAR agent for purposes of filing documents with the SEC, and Preston Burnett worked on its account in this capacity. | Longo Decl. Ex. 9 [Investigative Testimony of Edward Tobler, Aug. 23, 2016 ("Tobler" 11:3-24, 19:65-20:25]<br><br>Longo Decl. Ex. 55 [Investigative Testimony of Preston Burnett, Aug. 24, 2016 ("Burnett") 19:10-20:25, 21:1-7].<br><br>Longo Decl. Ex. 36 |
| 97.      Issuer Direct also provided IMMA transfer agent services, and Eddie Tobler worked on its account in this capacity. | Longo Decl. Ex. 9 [Tobler 33:7-16] |
| 98.      McDiarmid and Telford were the | Longo Decl. Ex. 36 |

| Uncontroverted Fact | Evidence |
|---|---|
| authorized contacts for IMMA's EDGAR/transfer agent services with Issuer Direct, and Telford was listed as the CFO in IMMA's agreement with Issuer Direct. | Longo Decl. Exs. 55; 9 [Burnett 21:16-24, 22:23-23:2; Tobler 40:19-41:16, 43:17-44:9 ] |
| 99.   MacDonald Tuskey was securities counsel for IMMA. | Longo Decl. Ex. 56 [Goldman 50:22-51:10] |
| 100.   Telford was copied on the final draft of the Form S-1 registration statement from counsel, for the auditors' signoff. | Longo Decl. Ex.42 Longo Decl. Ex. 10 [Weigel 34:2-35:11] |
| 101.   Telford was copied on communications with IMMA's EDGAR agent in connection prior to the issuance of its SEC filings. | Longo Decl. Exs. 38; 51 Longo Decl. Exs. 9; 55 [Tobler 61:4-16; Goldman 49:17-51:25] |
| 102.   Telford was also copied on communications with IMMA's EDGAR/transfer agent for purposes of IMMA's shares being deposited in brokerage firm accounts. | Longo Decl. Exs. 37; 39 Longo Decl. Ex. 9 [Tobler 54:17-55:1, 57:4-58:13, 64:1-7] |
| 103.   Ingenium resigned in December 2014 as IMMA's auditor. | Longo Decl. Ex. 50 Longo Decl. Ex. 10 [Weigel 157:12-158:9] |
| 104.   Ingenium decided to resign as IMMA's auditor due, in part, to the lack of any apparent business operations by IMMA. | Weigel Decl., ¶ 18 |
| 105.   PLS CPA became IMMA's successor auditor. | Longo Decl. Exs. 10; 6 [Weigel 160:2-4 ; Park 54:19-55:17] |

19

| Uncontroverted Fact | Evidence |
| --- | --- |
| 106.   Telford was listed as the primary contact for IMMA's audits by PLS. | Longo Decl. Ex. 6 [Park 59:2-61:14]<br><br>Longo Decl. Ex. 118 at SEC-PLSCPA-P-0000427 |
| **IMMA's Form S-1** | |
| 107.   IMMA's S-1 was initially filed on January 7, 2013, and after six amendments, went effective on October 10, 2013. | Longo Decl. Ex. 48 ; Ex. 13; Ex. 104<br><br>Longo Decl. Ex. 10 [Weigel 138:10-139:2] |
| 108.   A. McCandless did not sign or authorize her signature to be used on the S-1, though it purports to bear her signature. | Longo Decl. Ex. 3 [Amber McCandless 112:10-20, 114:9-118:10]<br><br>Longo Decl. Ex. 13 |
| 109.   The S-1 states that Amber McCandless is the sole officer and director of the company. | Longo Decl. Ex. 13 at 59 |
| 110.   The S-1 states that IMMA "depend[s] upon the continued contributions of our executive officer [who] handles ***all of the responsibilities in the area of corporate administration*** and business development." (emphasis added). | Longo Decl. Ex. 13 at 59 |
| 111.   IMMA's S-1 did not mention McDiarmid in any capacity. | Longo Decl. Ex. 13 |
| 112.   The only mention of Telford in the S-1 was | Longo Decl. Ex. 13 at 18, 65 |

| Uncontroverted Fact | Evidence |
|---|---|
| that he had "voting and dispositive control over securities held by Pompeii" (p.18) and was "the common owner of Denon, Ecogenics and Pompeii." | |
| 113.    IMMA's S-1 states that, other than as described in the Selling Security Holders section at p.18, "none of the selling security holders or their beneficial owners has had a material relationship with us other than as a security holder at any time within the past three years, or has ever been one of our officers or directors or an officer or director of our predecessors or affiliates." | Longo Decl. Ex. 13 at 19 |
| 114.    The S-1 references the shares purportedly issued to the selling shareholders in the "private placements." | Longo Decl. Ex. 13 at 39, 51 |
| 115.    Pompeii is listed in IMMA's S-1s as a selling security holder of 500,000 shares, or 4.46%. | Longo Decl. Ex. 3 at 18 |
| 116.    Pompeii's receipt of 825,000 shares through its consulting agreement with IMMA, dated October 30, 2012, was not disclosed as a related party transaction in the S-1. | Longo Decl. Ex. 13 at 65 |
| 117.    Ecogenics's receipt of 275,000 shares through its consulting agreement with IMMA, dated September 30, 2012,  was not disclosed as a | Longo Decl. Ex. 13 at 65 |

| Uncontroverted Fact | Evidence |
|---|---|
| related party transaction in the S-1. | |
| 118.   As of the filing of the S-1, Telford, through his ownership of Ecogenics and Pompeii, owned 1,100,000 shares, or 9.82%. | Longo Decl. Ex. 27 at F_000434-486; Ex. 78; Ex. 88<br><br>Longo Decl. Ex. 5 [Meza 63:10-65:2]<br><br>Weigel Decl. ¶ 14<br><br>Conte Decl. ¶¶ 25-26, Exs. 23-24 |
| 119.   The S-1 does not disclose any affiliation between McDiarmid and Pompeii or Ecogenics. | Longo Decl. Ex. 13 |
| 120.   The S-1 does not disclose that Telford beneficially owned 9.9% through Pompeii's 825,000 shares (7.4%) and Ecogenics' 275,000 shares (2.5%) | Longo Decl. Ex. 13 |
| 121.   As a related party transaction, the S-1 states that as of September 30, 2012, IMMA issued 1,000,000 shares to Sienna McCandless for consulting services. | Longo Decl. Ex. 13 at 65 |
| 122.   Sienna McCandless did not agree to provide consulting services to IMMA in exchange for shares. | Longo Decl. Ex. 4 [Sienna McCandless 45:13-24, 46:10-17] |
| 123.   The S-1 states that Amber McCandless owns 3,000,000 shares. | Longo Decl. Ex. 13 at 64 |

| Uncontroverted Fact | Evidence |
|---|---|
| 124.   Amber McCandless did not pay for or receive any shares. | Longo Decl. Ex. 3 [Amber McCandless 54:1-8, 54:19-56:19, 58:14-60:4] |
| 125.   Had Ingenium known Amber McCandless never received any IMMA shares, never saw the share subscription or consulting agreements that Telford had forwarded to Ingenium and did not sign those agreements or authorize anyone to sign them on her behalf, did not authorize IMMA to enter into a loan agreement with Morpheus and did not provide Morpheus with any IMMA shares, Ingenium  would have cancelled the engagement and would not have provided IMMA with an audit opinion letter in support of its S-1 registration statement or in support of its annual or periodic reports because of the risk that IMMA's financial statements were materially false and misleading and that IMMA was a potential vehicle for fraudulently trading stock in a manipulative pump and dump scheme. | Weigel Decl. ¶ 19 |
| 126.   Had Ingenium known that Sienna McCandless never received any shares in IMMA, was not aware she was the owner of any shares, provided no consulting services to IMMA, was not aware she was supposed to receive shares in IMMA in exchange for such services, had not | Weigel Decl. ¶ 20 |

| Uncontroverted Fact | Evidence |
|---|---|
| heard of Ecogenics and had not provided any consulting services to it, and did not provide or transfer shares in IMMA to Ecogenics or to anyone else, Ingenium would have cancelled the engagement and would not have provided IMMA with an audit opinion letter in support of its S-1 registration statement or in support of its annual or periodic reports because of the risk that IMMA's financial statements were materially false and misleading and that IMMA was a potential vehicle for fraudulently trading stock in a manipulative pump and dump scheme. | |
| 127.   Had Ingenium known that Telford, along with McDiarmid, controlled IMMA, that Telford, through his ownership of Ecogenics and Pompeii beneficially owned 9.9% of IMMA's stock, or the actual affiliations between McDiarmid and Telford, the nominees, and IMMA, or the false statements concerning IMMA's initial capitalization contained in its S-1 registration statement, Ingenium would have cancelled the engagement and would not have provided IMMA with an audit opinion letter in support of its S-1 registration statement or in support of its annual or periodic reports, because of the risk that IMMA's financials were materially false and | Weigel Decl. ¶ 20 |

| Uncontroverted Fact | Evidence |
|---|---|
| misleading and that IMMA was a potential vehicle for fraudulently trading stock in a manipulative pump and dump scheme. | |

### C. False or Misleading Statements in IMMA's Form 211 Process and in the Deposit of IMMA's Shares with the Brokerages

| Uncontroverted Fact | Evidence |
|---|---|
| *IMMA's Form 211 Process* | |
| 128.  Glendale Securities is both a broker and a market maker.  A market maker is a firm that stands ready to buy or sell a stock at publicly quoted prices.  Among other services, Glendale Securities: offers retail brokerage accounts; accepts the deposit of shares of stock, subject to documentation requirements and compliance review, including OTCBB, OTCQB,  and Pink Sheet stocks; and facilitates sponsors' securities for quotation clearance by filing Form 211 applications, pursuant to SEC Rule 15c2-11.  Quotation clearance allows the sponsoring market maker to post offers to buy (bids) and sell (asks) for consideration by the investing public. | Declaration of Eric Flesche filed concurrently herewith ("Flesche Decl.") ¶ 5; Declaration of George Castillo filed concurrently herewith ("Castillo Decl.") ¶ 5 |
| 129.  FINRA typically requires issuers to have least 30 shareholders with free trading shares, at least 1 million shares outstanding, and at least 250,000 free trading shares. | Flesche Decl. ¶ 8 |

| Uncontroverted Fact | Evidence |
|---|---|
| 130.   The number of shareholders of an issuer, and the concentration of share ownership between and among the shareholders, are important, not only for FINRA quotation approval purposes, but also to assess the probability that a viable market exists, or can be created, for the purchase and sale of the issuer's stock.  The more shareholders an issuer has, and the more even the distribution of shares amongst those shareholders, are both positive indicators that a viable market can be created for the issuer's shares. | Castillo Decl. ¶ 8 |
| 131.   Eric Flesche, George Castillo and Leticia Meza of Glendale worked with McDiarmid to prepare the Form 211. | Longo Decl. Ex. 23<br><br>Longo Decl. Ex. 5 [Meza 22:16-23:14]<br><br>Flesche Decl. ¶ 10 |
| 132.   IMMA's Form 211 was based, in large part, on the information provided by McDiarmid to Glendale Securities. | Longo Decl. Ex. 119<br><br>Castillo Decl. ¶ 10 |
| 133.    In September 2013, Meza sent McDiarmid an Information Statement, Filing Agreement and Disclosure Questionnaire, requesting that he send the subscription agreements and form of payment. | Longo Decl. Ex. 23<br><br>Longo Decl. Ex. 5 [Meza 22:16-23:14, 26:15-29:4] |
| 134.   The Information Statement, Filing | Longo Decl. Ex. 24 |

| Uncontroverted Fact | Evidence |
|---|---|
| Agreement and Subscription Agreements go to FINRA for the Form 211 process. | Longo Decl. Ex. 5 [Meza 26:15-29:4, 29:14-17] |
| 135.   In October 2013, McDiarmid sent Meza the completed 211 submission package, including the subscription agreements, consulting agreements, and a listing of shareholders that included the founders' shares. | Longo Decl. Ex. 24<br><br>Longo Decl. Ex. 5 [Meza 30:1-32:8] |
| 136.   McDiarmid also included in the package to Glendale his "verification of receipt of funds by outside company consultant" in the package, which he signed, saying he worked for Ecogenics, which had been hired by IMMA to source investment and collected cash from 12 shareholders, and then was "directed by IMMA management" to pay the funds to service providers. | Longo Decl. Ex. 24 at SEC-GS-E25014<br><br>Longo Decl. Ex. 5 [Meza 30:4-31:20] |
| 137.   In October 2013, McDiarmid sent Meza at Glendale the shareholder list from Tobler at Issuer Direct. | Longo Decl. Ex. 25<br><br>Longo Decl. Ex. 5 [Meza 47:22-49:3] |
| 138.   The shareholder list reflected the private placement shares, the founders' shares and the shares issued pursuant to the consulting agreements. | Longo Decl. Ex. 25<br><br>Longo Decl. Ex. 5 [Meza 47:22-49:3] |
| 139.   IMMA's Form 211 application lists Amber | Longo Decl. Exs. 119; 13 |

| Uncontroverted Fact | Evidence |
|---|---|
| McCandless as the beneficial owner of 3,000,000 IMMA shares, or 26.79% of IMMA's outstanding shares.  The attachments to IMMA's Form 211 also include various subscription agreements and consulting agreements, purportedly signed by Amber McCandless, in her capacity as CEO of IMMA, by which various amounts of IMMA shares were purportedly transferred to other persons and/or entities. | Flesche Decl. ¶ 13; Castillo Decl. ¶ 11 |
| 140.   IMMA's Form 211 also refers to IMMA's S-1 and the amendments thereto, which Glendale Securities reviewed as part of its due diligence in connection with the preparation of IMMA's Form 211.  Amendment number six (6) to IMMA' S-1 states that IMMA entered into a loan agreement with Morpheus Financial Corporation ("Morpheus"), a shareholder of IMMA, and that Morpheus had agreed to loan IMMA up to $75,000, of which $27,500 had been drawn down. | Longo Decl. Ex. 119<br><br>Flesche Decl. ¶ 15; Castillo Decl. ¶ 12 |
| 141.   In November 2013, McDiarmid told Glendale Securities that Ecogenics would be the shareholder making the initial deposit of IMMA shares into Ecogenics' account and that it was a purchaser of shares from the S-1. | Flesche Decl. ¶ 17 |
| 142.   Telford represented to Glendale Securities | Flesche Decl. ¶ 22; Castillo |

| Uncontroverted Fact | Evidence |
|---|---|
| that Ecogenics acquired its 625,000 IMMA shares pursuant to certain stock purchase agreements and services agreements, and that it was not an affiliate of IMMA.  With respect to the 500,000 share certificate, according to the documents presented to Glendale Securities, on or about September 30, 2012, Sienna McCandless entered into a consulting agreement with IMMA and that in exchange for her services would receive shares of IMMA.  Thereafter, on or about November 21, 2013, Sienna McCandless, "for value received," transferred her 500,000 shares to Ecogenics. | Decl. ¶ 17 |
| 143.   Amber McCandless had never seen the Form 211 package McDiarmid submitted and does not recall signing any of the documents in the Form 211 package, though the Form 211 Filing Agreement purports to have her handwritten signature. | Longo Decl. Ex. 24<br><br>Longo Decl. Ex. 3 [Amber McCandless 72:16-75:16] |
| 144.   Based on IMMA's S-1 registration statement, Glendale Securities believed that Ecogenics was a purchaser of IMMA shares. | Flesche Decl. ¶ 18 |
| 145.   Had Glendale Securities known that that Amber McCandless never received any shares in IMMA, never signed IMMA's S-1 registration statement or any amendments thereto or | Flesche Decl. ¶ 16; Castillo Decl. ¶ 13 |

| Uncontroverted Fact | Evidence |
|---|---|
| authorized anyone to sign them on her behalf, she knew nothing about any of IMMA's subscription agreements, never authorized the private offering of any IMMA shares, did not sign any of the IMMA consulting agreements that purportedly bear her signature, and did not approve of any loan agreements between IMMA and Morpheus. it would not have submitted a Form 211 application to FINRA on IMMA's behalf, and would not have provided any brokerage or market maker services to IMMA or to any of its shareholders. | |
| 146.   Telford represented himself to Glendale Securities to be the sole officer, director and secretary of Ecogenics and was the beneficial owner of and sole authorized person on Ecogenics' brokerage account at Glendale Securities. | Flesche Decl. ¶ 18; Castillo Decl. ¶ 14 |
| 147.   Glendale submitted IMMA's initial Form 211 application on or about October 30, 2013. | Longo Decl. Ex. 27<br><br>Longo Decl. Ex. 5 [Meza 63:10-64:22] |
| 148.   Glendale received a deficiency letter dated November 7, 2013, which Meza forwarded to McDiarmid. | Longo Decl. Ex. 26<br><br>Longo Decl. Ex. 5 [Meza 61:3-21] |

| Uncontroverted Fact | Evidence |
|---|---|
| 149.   Among FINRA's comments was to require a statement that no one had control of the shares other than the persons listed. | Longo Decl. Ex. 26 |
| 150.   FINRA, in reliance on the information Glendale Securities had submitted to FINRA pursuant to Exchange Act Rule 15c2-11, had cleared Glendale Securities' request to submit a bid and ask quote for IMMA on the OTC Bulletin Board and OTC Link. | Flesche Decl. ¶ 28; Castillo Decl. ¶ 21<br><br>Longo Decl. Ex. 19 at SEC-GS-E-0037178<br><br>Longo Decl. Ex. 5 [Meza 65:8-18] |
| 151.   On February 24, 2014, IMMA's shares became DTC eligible. | Longo Decl. Ex. 40<br><br>Longo Decl. Ex. 9 [Tobler 67:12-68:9] |
| 152.   FINRA cleared Glendale to offer a bid/ask price on the OTC Bulletin Board and in OTC Link on April 9, 2014. | Longo Decl. Ex. 28<br><br>Longo Decl. Ex. 5 [Meza 68:2-68:14] |
| 153.   Had Glendale Securities known that Sienna McCandless never received any shares in IMMA, was not aware she was the owner of any shares, provided no consulting services to IMMA, was not aware she was supposed to receive shares in IMMA in exchange for such services, had not heard of Ecogenics and had not provided any | Flesche Decl. ¶ 23; Castillo Decl. ¶ 18 |

| Uncontroverted Fact | Evidence |
|---|---|
| consulting services to it, and did not provide or transfer shares in IMMA to Ecogenics or to anyone else, it would not submitted IMMA's Form 211 application to FINRA, would not have accepted the deposit of any IMMA shares, and would not provided brokerage or market maker services to IMMA or to any of its shareholders. | |
| 154.   Had Glendale Securities known about the actual affiliations between McDiarmid and Telford, the nominees, and IMMA, or the false statements concerning IMMA's initial capitalization contained in the Form 211 application, it would not have submitted IMMA's Form 211 application to FINRA, would not have accepted the deposit of any IMMA shares, and would not have provided brokerage or market maker services to IMMA or to any of its shareholders | Flesche Decl. ¶ 23 |
| **The Deposit of IMMA's Shares with Brokerages for Trading** | |
| **Opening of and Deposits to Pompeii's Meyers Account** | |
| 155.   McDiarmid and Telford opened Pompeii's Meyers account in January 2014, with Telford as the sole signatory. | Longo Decl. Ex. 29  Longo Decl. Ex. 2 [Alligood Depo 18:10-17] |
| 156.   On behalf of Pompeii, Telford on February 17, 2014 instructed Issuer Direct to transfer | Longo Decl. Ex. 39 |

| Uncontroverted Fact | Evidence |
|---|---|
| Pompeii's 500,000 shares of IMMA to the Meyers account. | Longo Decl. Ex. 9 [Tobler 64:1-7] |
| 157.   When Alligood inquired, Telford told Alligood he did not work with or for IMMA. | Longo Decl. Ex. 1 [Alligood Investigative 47:13-48:15, 49:22-50:5] |
| 158.   Other than Pompeii having 500,000 shares, Alligood knew of no connection between Pompeii and IMMA or McDiarmid and IMMA when the shares were deposited. | Longo Decl. Ex. 1 [Alligood Investigative 48:19-23, 49:22-50:5] |
| 159.   On February 27, 2014, Telford signed the COR Clearing Microcap and Unregistered Security Policy Questionnaire for Pompeii as to the deposit of IMMA shares, attesting that Pompeii had no relationship with the issuer and had only the 500,000 shares. | Longo Decl. Ex. 31 at 4072<br><br>Longo Decl. Ex. 2 [Alligood Depo 63:17-64:2] |
| 160.   The Questionnaire did not disclose the additional 325,000 shares Pompeii received in 2012 pursuant to its consulting agreement. | Longo Decl. Ex. 31 at 4072 |
| 161.   Also on February 27, 2014, Telford signed the Rule 144 Seller's Representation Letter attesting that Pompeii was not an affiliate of IMMA. | Longo Decl. Ex. 31 at 4077<br><br>Longo Decl. Ex. 1 [Alligood Investigative, 63:17-64:2, 66:16-67:6] |
| 162.   Meyers required the forms to understand whether the IMMA shares were freely tradeable. | Longo Decl. Ex. 2 [Alligood Depo 37:19-38:21, 38:8-40:2] |
| 163.   Had Alligood known the true associations | Longo Decl. Ex. 2 [Alligood |

33

| Uncontroverted Fact | Evidence |
|---|---|
| of Telford and McDiarmid with Pompeii and IMMA, he would not have accepted the shares for deposit. | Depo 46:19-47:18, 48:17-24, 50:15-51:9] |
| **_Opening of and Deposits to Ecogenics' Glendale Accounts_** | |
| 164.   In connection with Ecogenics' first Glendale account, in November 2013, McDiarmid told Glendale that Ecogenics would be the shareholder making the initial deposit of shares into Ecogenics' account and that they were a purchaser of shares from the S-1. Telford represented himself to Glendale Securities to be the sole officer, director and secretary of Ecogenics and was the beneficial owner of and sole authorized person on Ecogenics' brokerage account at Glendale Securities. | Longo Decl. Ex. 61<br><br>Longo Decl. Ex. 3 [Amber McCandless 133:14-20]<br><br>Flesche Decl. ¶ 18<br><br>Castillo Decl. ¶ 14 |
| 165.   In November, 2013, Telford signed Glendale Securities' Foreign Account Questionnaire and Vision account opening documentation on behalf of Ecogenics. | Longo Decl. Exs. 79, 117<br><br>Castillo Decl. ¶¶ 14-15 |
| 166.   In April 2014, Telford signed Glendale's Deposit Security Request ("DSR") form to deposit 625,000 IMMA shares to Ecogenics' account, consisting of 125,000 shares Ecogenics received from Mel Grace Carlos, and the 500,000 shares Ecogenics had purportedly received from Sienna McCandless in November 2013. | Longo Decl. Ex. 89 at SEC-FINRA-E-0008892<br><br>Castillo Decl. ¶ 16 |

| Uncontroverted Fact | Evidence |
|---|---|
| 167.   The DSR form stated that Ecogenics owned or controlled a total of 625,000 shares. | Longo Decl. Ex. 89 at SEC-FINRA-E-0008889<br><br>Castillo Decl. ¶ 16 |
| 168.   The DSR form did not disclose the 275,000 shares Ecogenics obtained in its 2012 consulting agreement. | Longo Decl. Ex. 89<br><br>Castillo Decl. ¶ 16 |
| 169.   In connection with Ecogenics' second Glendale account, Telford signed account opening documentation in December 2014. | Longo Decl. Ex. 80 at  SEC-FINRA-E_0005318 |
| 170.   The forms Telford executed stated that Ecogenics was not an affiliate of IMMA. | Longo Decl. Exs. 80; 89 |
| 171.   Had Glendale Securities known that Sienna McCandless never received any shares in IMMA, had not heard of Ecogenics and had not provided any consulting services to it, and did not provide or transfer shares in IMMA to Ecogenics or to anyone else, it would not have accepted the deposit of any IMMA shares. | Flesche Decl. ¶ 23; Castillo Decl. ¶ 18 |
| 172.   Had Glendale Securities known about the actual affiliations between McDiarmid and Telford, the nominees, and IMMA, or the false statements concerning IMMA's initial capitalization contained in the Form 211 application, it would not have accepted the deposit of any IMMA shares. | Flesche Decl. ¶ 23 |

**D.     False or Misleading Statements in IMMA's Periodic Filings**

| *IMMA's Form 10-Ks* | |
|---|---|
| 173.   IMMA filed Form 10-K reports for the years ended October 31, 2013 and October 31, 2014, on February 13, 2014 and February 21, 2015, respectively. | Longo Decl. Exs. 52; 120 |
| 174.   McCandless resigned as CEO on October 28, 2014. | Longo Decl. Ex. 67 |
| 175.   Both the 2013 and 2014 Form 10-Ks stated that IMMA was a "development stage" company with "no revenues [and] net losses" that had "not yet commenced the sales of any products or services" and had "no cash on hand." | Longo Decl. Ex. 52 at 2, 13; Ex. 120 at 2, 13 |
| 176.    A. McCandless did not sign or authorize her signature to be used on the 2013 10-K, though she is listed as the signatory. | Longo Decl. Ex. 52<br><br>Longo Decl. Ex. 3 [Amber McCandless 178:18-179:12] |
| 177.   The 2013 10-K states that Amber McCandless is the sole executive officer and director of the company. | Longo Decl. Ex. 52  at 17 |
| 178.   The 2013 10-K states that IMMA "depend[s] upon the continued contributions of our executive officer [who] handles *all of the responsibilities in the area of corporate administration* and business development" (emphasis added). | Longo Decl. Ex. 52 at 16 |

| | |
|---|---|
| 179.   The 2013 10-K references Amber McCandless as IMMA's President, CEO, CFO, Treasurer, Director (its Principal Executive Officer, Principal Financial Officer and Principal Accounting Officer) and omits any reference to McDiarmid or Telford's functions. | Longo Decl. Ex. 52 at 48 |
| 180.   The 2013 and 2014 10-Ks reference the shares purportedly issued to the selling shareholders in the "private placements." | Longo Decl. Ex. 52 at 31, 37; Ex. 120 at F-5 |
| 181.   The 2013 10-K states that during the year ended October 31, 2012,  IMMA issued 500,000 shares to Sienna McCandless. | Longo Decl. Ex. 52 at 36 |
| 182.   The 2013 and 2014 10-Ks reference the Morpheus loan. | Longo Decl. Ex. 52 at 36; Ex. 120 at 33 |
| 183.   The private placements, consulting agreement and Morpheus loan were unauthorized and fictitious corporate transactions. | Longo Decl. Ex. 3 [Amber McCandless 54:1-8, 54:19-56:19, 57:5-58:11, 58:14-60:4, 72:16-75:16]; Longo Decl. Ex. 4 [Sienna McCandless 45:13-24, 46:10-17] |
| ***IMMA's Form 10-Qs*** | |
| 184.   IMMA filed Form 10-Q reports on March 7, 2014, June 6, 2014 and September 15, 2014. | Longo Decl. Exs. 64-66 |
| 185.   Amber McCandless did not review, nor sign, nor authorize her signature to be used on any of the 10Qs filed in 2014, though they purport to bear her electronic signature. | Longo Decl. Exs. 64-66 <br><br> Longo Decl. Ex. 3 [Amber McCandless 182:19-185:7] |

| | |
|---|---|
| 186.   The 10-Qs filed during her tenure referenced A. McCandless as IMMA's President, CEO, CFO, Treasurer, Director (its Principal Executive Officer, Principal Financial Officer and Principal Accounting Officer) and omitted any reference to McDiarmid or Telford. | Longo Decl. Ex. 64 at 12, Ex. 65 at 12, Ex. 66 at 12 |
| 187.   The 10-Qs each referenced the Morpheus loan, which was never authorized by McCandless on behalf of IMMA. | Longo Decl. Ex. 64 at 8, Ex. 65 at 8, Ex. 66 at 8

Longo Decl. Ex. 3 [Amber McCandless 57:5-58:11] |

### E.   Defendants' Promotional Campaign for IMMA's stock

| Uncontroverted Fact | Evidence |
|---|---|
| *Direct Info Share* | |
| 188.   Mary Rose Casin reserved the domain name www.directinfoshare.com in June 2014 through GoDaddy.com, where the associated "Shopper ID" in GoDaddy.com's records was 85504390. | Longo Decl. Ex. 90 |
| 189.   Between November 2014-2016, Casin received $195,933 in wire transfers from Telford's entities, Pompeii and Ecogenics. | Conte Decl. ¶ 22, Ex. 20

Longo Decl. Ex. 77 |
| 190.   According to GoDaddy.com's payment records for Shopper ID 85504390, various charges associated with the Direct Info Share website between June 2014 and July 2015 were | Longo Decl. Exs. 105, 116 |

| Uncontroverted Fact | Evidence |
|---|---|
| billed to the credit card of Jason McDiarmid, whose contact email was listed as phantasmvisionary@yahoo.com, as well as to Christy Fabros, a name under which McDiarmid conducts email communications. | |
| 191.   In April 2014, Telford sent Meyers Assocs. a copy of a wire transfer from Casin to Pompeii. | Longo Decl. Ex. 68 <br><br> Longo Decl. Ex. 2 [Alligood Depo 57:20-58:2] |
| 192.   Direct Info Share's website described it as a "respected investor relations/financial communications company" that "specialize[d] in discovering undervalued companies" with "true and realistic potential for substantial growth…" | Longo Decl. Ex. 91 |
| 193.   Direct Info Share's website did not disclose that it was controlled by affiliates/shareholders of IMMA who were engaged in the sale of IMMA stock. | Longo Decl. Ex. 91 |
| 194.   Direct Info Share's representatives described it as "an Internationally respected investor relations and financial communications company [that] specialize[d] in sourcing and bringing awareness to those undiscovered companies listed in the US on the OTCBB, OTCQB or Pink sheets that we believe have potential for significant future growth…" | Longo Decl. Ex. 111 at SEC-FINRA-E-0004511 |

| Uncontroverted Fact | Evidence |
|---|---|
| 195.   As of at least November 2014 through at least March 2015, representatives of Direct Info Share were soliciting investments in IMMA by phone through cold-calls. | Decl. of Donald Santavicca filed concurrently herewith ("Santavicca Decl.") ¶¶ 3-6; Declaration of John Frazier filed concurrently herewith ("Frazier Decl.") ¶¶ 3-7 |
| 196.   Direct Info Share agents encouraged investors, including the elderly, to sell their existing holdings in order to purchase IMMA stock, including retirement monies. | Santavicca Decl. ¶ 4; Frazier Decl. ¶ 9 |
| 197.   Direct Info Share's agents told investors, for example, that there was:<br>• A 99% percent chance IMMA would be bought out;<br>• That IMMA was trying to move to the NASDAQ;<br>• That the investor would receive an incentive for purchasing a certain volume of shares;<br>• That the investor could double his money;<br>• That IMMA's stock was headed to $12/share; and<br>• That the agent would tell the investor when to sell, based on when day-traders started to trade IMMA's stock. | Santavicca Decl. ¶¶ 6, 7, 9; Frazier Decl. ¶ 5, 8, 10 |
| 198.   When IMMA investors tried to contact | Santavicca Decl. ¶¶ 11-13; |

| Uncontroverted Fact | Evidence |
|---|---|
| their respective Direct Info Share agents or IMMA after the stock price fell, they could not reach anyone at either firm. | Frazier Decl. ¶ 15<br><br>Longo Decl. Exs. 111-113 |
| 199.   Direct Info Share's agents did not disclose to potential investors that it was controlled by affiliates/shareholders of IMMA who were engaged in the sale of IMMA stock. | Santavicca Decl. ¶¶ 15-17; Frazier Decl. ¶¶ 12-14<br><br>Longo Decl. Ex. 111 at SEC-FINRA-E-0004511 |
| 200.   IMMA investors would have wanted to know that affiliates who were selling their own shares were behind Direct Info Share, and that the disclosed control person was not actually the person running the company, but rather that it was run by undisclosed persons. | Santavicca Decl. ¶¶ 15-17; Frazier Decl. ¶¶ 12-14 |
| ***Think Ink Marketing Campaign*** | |
| 201.   McDiarmid contacted Claire Stevens of Think Ink Marketing in April 2015, and asked her to put together a schedule of digital advertising opportunities for IMMA, including emails as well as text messaging. | Longo Decl. Ex. 15<br><br>Longo Decl. Ex. 7 [Stevens 26:8-23, 29:7-13] |
| 202.   McDiarmid consulted with Stevens on the "better investing days" to run the ads, and told her that other advertising was also occurring. | Longo Decl. Ex. 17<br><br>Longo Decl. Ex. 7 [Stevens 38:22-39:5, 42:4-43:7] |
| 203.   Ecogenics was the billing party for the advertising, for which it paid over $100,000 | Longo Decl. Ex. 20 |

| Uncontroverted Fact | Evidence |
|---|---|
| between April 24, 2015 and May 7, 2015. | Longo Decl. Ex. 7 [Stevens 57:16-58:4] |
| 204.   McDiarmid approved the planned schedule of the email blasts. | Longo Decl. Ex.16<br><br>Longo Decl. Ex. 7 [Stevens 34:7-35:7] |
| 205.   Through Ecogenics' advertising buy, at least five different email ads ran between April 26, 215 and May 5, 2015 in various penny stock publications:<br>• "Interactive Multi-Media Auction: Live-Streaming Art Auctions" (4/26/15)<br>• "IMMA Plans to Enter 60 Billion Dollar Art Auction Industry"  (4/27/15 & 4/28/15: www.TheStreetAlert.com; 4/28/15 &4/29/15 www.ThePennyReporter.com )<br>• "IMMA Announces Plans for First Live Streaming Auction Event" (4/30/15: www.EmergingMarketsConsulting.com)<br>• "IMMA – Pure Play Equity Investment Opportunity" (5/04/15: www.TheStreetAlert.com)<br>• "Urgent Technical Alert! IMMA" (5/05/15: www.FutureMoneyTrends.com) | Longo Decl. Exs. 18; 121<br><br>Longo Decl. Ex. 7 [Stevens 43:11-44:14, 47:7-48:16, 54:15-55:13] |
| 206.   The emails did not disclose that the promotional campaign was organized and funded | Longo Decl. Exs. 18; Longo Decl. Exs. 18; 121 |

| Uncontroverted Fact | Evidence |
|---|---|
| by IMMA affiliates who were selling their shares. | Longo Decl. Ex. 7 [Stevens 43:11-44:14, 47:7-48:16, 54:15-55:13] |
| 207.   During the Think Ink email campaign between April 26, 2015 and May 5, 2015, IMMA's stock price increased from $1.39 to $1.62 percent per share, a 16.5% increase. | Conte Decl. ¶¶ 23-25, Exs. 21-22 |
| 208.   On the last day of the email campaign, IMMA's stock price fell from $1.38 to $.67 per share, a 51% drop. | Conte Decl. ¶¶ 23-25, Exs. 21-22 |

### F.   Telford's Stock Sales and Disposition of Proceeds

| Uncontroverted Fact | Evidence |
|---|---|
| *Ecogenics' stock sales and proceeds transfers* | |
| 209.   Glendale Securities' monthly account statements for the Ecogenics account for the period April 1, 2014 through September 30, 2015. reflect Telford's deposit of 625,000 IMMA shares on or about April 8, 2014, and Telford's subsequent sales of those shares between November 2014 and April 2015.  The only securities that Telford traded or sold through Ecogenics' Glendale Securities account were shares of IMMA. | Flesche Decl. ¶ 25 Conte Decl. ¶ 27, Ex. 25 |
| 210.   Telford personally directed Glendale | Flesche Decl. ¶ 26; Castillo |

| Uncontroverted Fact | Evidence |
|---|---|
| Securities to wire monies from Ecogenics' account at Glendale Securities to Ecogenics' account at HSBC in Hong Kong for the period between October 2014 and March 2015, totaling $2,896,500. | Decl. ¶¶ 19-20<br><br>Conte Decl. ¶ 16, Ex. 12<br><br>Longo Decl. Exs. 98-100 |
| 211.   Between October 9, 2014 and April 24, 2015, Ecogenics' two accounts at Glendale Securities netted $2,073,289 in trading in IMMA, from sales of 1,388,183 shares. | Conte Decl. ¶¶ 8-11, Exs. 3-7 |
| ***Pompeii's stock sales and proceeds transfers*** | |
| 212.   Between September 30, 2014 and March 30, 2015, Pompeii's account at Meyers netted $1,103,978.87 in trading in IMMA, selling 905,559 shares. | Conte Decl. ¶¶ 6-7, Exs.1-2 |
| 213.   Telford executed all of the trading in the account. | Longo Decl. Ex. 2 [Alligood Depo 77:8-20, 84:3-15] |
| 214.   According to Alligood, Telford directed the trading in Pompeii's account, speaking daily if not multiple times a day. | Longo Decl. Ex. 1 [Alligood Investigative 25:7-26:21] |
| 215.   Between August 15, 2014 and March 4, 2015, Telford signed four requests for wire transfers from Pompeii's Meyers brokerage account to Pompeii's HSBC account in Hong Kong totalling $653,000, and on April 1, 2015, signed a check request for $400,000. | Longo Decl. Exs. 32; 33; 34; 69; 71; 72<br><br>Longo Decl. Ex. 2 [Alligood Depo 61:17-62:4, 87:22-88:10, 90:21-91:6, 94:14-25, 98:20- |

| Uncontroverted Fact | Evidence |
|---|---|
| | 99:24, 107:16-23] |
| | Conte Decl. ¶¶ 14-15, Exs. 10-11 |
| 216.   Telford deposited the $400,000 from Pompeii Finance to his Bank of America account ending in on 4/1/15. | Conte Decl. ¶ 15 |
| | Longo Decl. Ex. 34 |
| 217.   When Meyers asked for more information about IMMA from Telford, Telford conferred with McDiarmid, got the business plan from McDiarmid, and sent it to Alligood, telling him he got it from IMMA. | Longo Decl. Ex. 1 [Alligood Investigative 97:19-98:14, 99:5-24, 100:1-2] |
| | Longo Decl. Exs. 95; 122 |
| 218.   Meyers notified Telford on April 21, 2015, that it was closing the Pompeii account due to doubts concerning IMMA's *bona fides*. | Longo Decl. Ex. 35 |
| | Longo Decl. Ex. 2 [Alligood Depo 110:24-111:15, 114:10-116:9] |
| 219.   Telford asked to receive the funds from the account closure in his own name rather than Pompeii's, but was told he could not. | Longo Decl. Ex. 96 |
| 220.   Telford asked to keep the account open and whether he could deposit shares of another company, but was told no. | Longo Decl. Ex. 2 [Alligood Depo 114:10-116:9] |
| | Longo Decl. Ex. 1 [Alligood Investigative 121:23-122:14] |
| ***Denon's stock sales and proceeds transfers*** | |

| Uncontroverted Fact | Evidence |
|---|---|
| 221.   Between October 13, 2014 and May 15, 2015, Denon's account at Schwab netted $138,967.32 in trading in IMMA, selling 571,508 shares. | Conte Decl. ¶¶ 12-13, Exs. 8-9 |
| 222.   Telford was the sole person authorized to execute trades in the account. | Longo Decl. Ex. 73 |
| 223.   In May and August 2015, Telford sent two requests to wire funds totalling $53,000 from Denon's Schwab brokerage account to Denon's HSBC account in Hong Kong. | Conte Decl. ¶ 17, Exs. 14-15<br><br>Longo Decl. Ex. 103 |
| 224.   The gross proceeds received by Denon, Ecogenics and Pompeii from sales of IMMA stock totaled at least $3,428,912.79, from trades of at least 2,865,250 shares of IMMA stock (adjusted to reflect a stock split on February 3, 2015 of 4:1 per share). | Conte Decl. ¶¶ 28-29 |
| 225.   The net proceeds received by Denon, Ecogenics and Pompeii from sales of IMMA stock totaled at least $3,316,235.48.  Prejudgment interest on this amount between October 30, 2014 and September 29, 2017, using the SEC's prejudgment interest calculation method, is $302,871.91. | Conte Decl. ¶¶ 30-32 |
| 226.   Telford's trades in the nominees' accounts amounted to between 50-75% of the total trading volume in IMMA's shares on 88 of the 167 | Conte Decl. ¶¶ 23-25, Exs. 20-21 |

| Uncontroverted Fact | Evidence |
|---|---|
| trading days between September 30, 2014 and May 29, 2015. | |

### G. Attempted Witness Tampering

| Uncontroverted Fact | Evidence |
|---|---|
| 227.   Sienna McCandless received an SEC subpoena for documents and testimony, directed to her, dated Nov. 7, 2015. | Longo Decl., Ex. 11<br><br>Longo Decl., Ex. 4 [Sienna McCandless 6:8-6:18] |
| 228.    She contacted her sister, who told her she contacted McDiarmid re: same. | Longo Decl., Ex. 4 [Sienna McCandless 16:5-21:20] |
| 229.   Through Amber McCandless, McDiarmid put Sienna McCandless in touch with two attorneys, one of whom represented her in her SEC testimony. | Longo Decl., Ex. 4 [Sienna McCandless 21:22-22:16] |
| 230.   McDiarmid sent S. McCandless Ex. 4, which has a list of "Documents to be Produced" and a "General Comments" section, and attaches her consulting agreements with IMMA (9/30/12, hand signed) and with Ecogenics (11/20/13, e-signed by her and Telford), and the stock power (11/21/13, hand signed). | Longo Decl., Ex. 12<br><br>Longo Decl., Ex. 4 [Sienna McCandless 16:5-21:20; 28:15-30:15] |
| 231.   Contrary to the "General Comments," McDiarmid was not a "business associate" of Sienna McCandless for 25 years; she was merely acquainted with him during that period. | Longo Decl., Ex. 12<br><br>Longo Decl., Ex. 4 [Sienna McCandless 27:17-22; 31:18- |

| Uncontroverted Fact | Evidence |
|---|---|
| | 33:5] |
| 232.   Contrary to the "General Comments," Telford was not a "business associate" of hers over a decade; she was not even aware of Telford before the subpoena. | Longo Decl., Ex. 12<br><br>Longo Decl., Ex. 4 [Sienna McCandless 35:24-36:6] |
| 233.   McDiarmid also called Sienna McCandless the day before her testimony. | Longo Decl., Ex. 4 [Sienna McCandless 21:16-20] |

### H.    Telford's Refusal to Testify Based on Fifth Amendment Privilege

| Uncontroverted Fact | Evidence |
|---|---|
| 234.   The SEC took Telford's deposition on July 17, 2018 by videoconference to Manila. | Longo Decl. Ex. 8 [Deposition Testimony of Kenneth Telford, August 17, 2018 ("Telford") 9:1-10] |
| 235.   Based on his Fifth Amendment privilege against self-incrimination, Telford refused to answer any questions regarding his personal or professional background, including his citizenship, marital status, CPA license, and telephone and email addresses. | Longo Decl. Ex. 8 [Telford 10:18-24, 11:8-13, 15:14-19, 16:2-17:10, 21:1-14] |
| 236.   Based on his Fifth Amendment privilege against self-incrimination, Telford refused to answer any questions regarding his answer to the complaint, or his production of information in discovery in this action. | Longo Decl. Ex. 8 [Telford 23:23-24:14, 25:20-26:9, 28:9-29:5] |
| 237.   Based on his Fifth Amendment privilege | Longo Decl. Ex. 8 [Telford 22: |

| Uncontroverted Fact | Evidence |
|---|---|
| against self-incrimination, Telford refused to answer any questions regarding his past or present association and contacts with Jason McDiarmid, and whether they had ever discussed the SEC's complaint against them. | 11-17, 29:6-30:22] |
| 238.   Based on his Fifth Amendment privilege against self-incrimination, Telford refused to answer any questions regarding his ownership, control or affiliation with Denon, including his control over its bank and brokerage accounts. | Longo Decl. Ex. 8 [Telford 31:5-24, 32:15-33:4, 34:4-13, 35:21-36:5, 36:8-17, 37:20-38:5]<br><br>Longo Decl. Exs. 73-74 |
| 239.   Based on his Fifth Amendment privilege against self-incrimination, Telford refused to answer any questions regarding his ownership, control or affiliation with Pompeii, including his control over its bank and brokerage accounts. | Longo Decl. Ex. 8 [Telford 39:17-40:6, 41:3-16, 43:5-44:3, 44:9-15, 45:9-46:14, 47:1-48:9, 48:24-50:1, 50:11-21]<br><br>Longo Decl. Exs. 29; 76-78; 120 |
| 240.   Based on his Fifth Amendment privilege against self-incrimination, Telford refused to answer any questions regarding his ownership, control or affiliation with Ecogenics, including his control over its bank and brokerage accounts. | Longo Decl. Ex. 8 [Telford 51:23-52:25, 56:18-57:16, 58:2-59:13, 59:25-61:5, 62:12-63:22, 65:15-66:23, 67:17-68:2]<br><br>Longo Decl. Exs. 79-80; 120; 81-83 |

| Uncontroverted Fact | Evidence |
|---|---|
| 241.   Based on his Fifth Amendment privilege against self-incrimination, Telford refused to answer any questions regarding Morpheus Financial, including where it was located and its affiliation with Telford, McDiarmid, Denon, Pompeii and Ecogenics. | Longo Decl. Ex. 8 [Telford 68:16-69:3, 69:17-25, 70:3-71:18]<br><br>Longo Decl. Ex. 84 |
| 242.   Based on his Fifth Amendment privilege against self-incrimination, Telford refused to answer any questions regarding IMMA's formation and initial capitalization (including the private placement, the "founders' shares," and consulting agreements) and the roles of Amber McCandless, straw CEO, or her sister Sienna McCandless, supposed consultant and shareholder. | Longo Decl. Ex. 8 [Telford 72:18-73:5, 73:19-74:20, 75:9-18, 76:18-25, 77:13-79:14, 81:9-15, 82:7-20, 83:22-84:8, 84:25-85:7, 85:14-21, 86:5-21, 87: 5-24, 88:20-89:25, 90:22-91:20, 92:21-93:16, 94:1-95:4, 95:24- 96:10, 96:11-22, 97:21-100:25, 101:8-16]<br><br>Longo Decl. Exs. 85-88 |
| 243.   Based on his Fifth Amendment privilege against self-incrimination, Telford refused to answer any questions regarding IMMA's S-1 registration statement. | Longo Decl. Ex. 8 [Telford 101:17-23102:7-103:25, 104:11-18, 105:5-24, 106:4-107:22, 109:14-22, 111:1-7, 111:16-112:7]<br><br>Longo Decl. Exs. 48; 5 |
| 244.   Based on his Fifth Amendment privilege against self-incrimination, Telford refused to | Longo Decl. Ex. 8 [Telford 112:15-114:9, 114:13-115:4, |

| Uncontroverted Fact | Evidence |
|---|---|
| answer any questions regarding IMMA's SEC filings on Forms 10-K or 10-Q. | 118:7-25, 120:5-123:1]<br><br>Longo Decl. Exs. 52; 120; 64-66 |
| 245.   Based on his Fifth Amendment privilege against self-incrimination, Telford refused to answer any questions regarding IMMA's Form 211 application. | Longo Decl. Ex. 8 [Telford 125:17-126:5, 126:20-127:12 127:20-128:3, 129:4-22, 130:5-11, 131:2-10]<br><br>Longo Decl. Exs. 24; 27; 119 |
| 246.   Based on his Fifth Amendment privilege against self-incrimination, Telford refused to answer any questions regarding his deposits of IMMA's shares in Pompeii's and Ecogenics' brokerage accounts for trading. | Longo Decl. Ex. 8 [Telford 131:20-132:17, 133:17-134:2, 134:22-135:11, 136:8-25, 137:3-138:3, 138:11-139:23, 141:2-141:23, 142:13-19, 142:20-145:12]<br><br>Longo Decl. Exs. 31; 39; 41; 75 |
| 247.   Based on his Fifth Amendment privilege against self-incrimination, Telford refused to answer any questions regarding the promotional activities for IMMA's stock, including his association with the investor calls made by agents of Direct Info Share, or with the email marketing campaign paid for by Ecogenics. | Longo Decl. Ex. 8 [Telford 145:24-146:23, 147:6-12, 148:3-23, 149:8-15, 149:18, 150:5-23, 153:6-154:12, 155:11-25, 145:9-157:3, 157:16-23, 156:9 – 157:3]<br><br>Longo Decl. Exs. 17; 18; 19; |

| Uncontroverted Fact | Evidence |
|---|---|
| | 20; 21; 90; 91 |
| 248.   Based on his Fifth Amendment privilege against self-incrimination, Telford refused to answer any questions regarding Pompeii's trades of IMMA stock and the disposition of the proceeds of same. | Longo Decl. Ex. 8 [Telford 162:7-21, 164:2- 16,164:20-165:25, 167:8-16, 171:4-172:13, 173:20-174:24, 175:23-176:23, 178:3-180:17]  Longo Decl. Exs. 122; 34; 69-70; 92-95 |
| 249.   Based on his Fifth Amendment privilege against self-incrimination, Telford refused to answer any questions regarding Ecogenics' trades of IMMA stock and the disposition of the proceeds of same. | Longo Decl. Ex. 8 [Telford 185:11-23, 186:13-187:16, 189:7-15, 191:5-15]  Longo Decl. Exs. 97-100 |
| 250.   Based on his Fifth Amendment privilege against self-incrimination, Telford refused to answer any questions regarding Denon's trades of IMMA stock and the disposition of the proceeds of same. | Longo Decl. Ex. 8 [Telford 191:16-192:5, 192:15-194:21, 196:5-197:12, 198:5-199:17]  Longo Decl. Exs. 101-103 |
| 251.   Based on his Fifth Amendment privilege against self-incrimination, Telford refused to answer any questions regarding McDiarmid's or his role in connection with the SEC's subpoena to Sienna McCandless. | Longo Decl. Ex. 8 [Telford 200:25-201:17, 203:13-204:14]  Longo Decl. Ex. 12 |
| 252.   Based on his Fifth Amendment privilege against self-incrimination, Telford refused to | Longo Decl. Ex. _ [Telford 206:20-208:20] |

| Uncontroverted Fact | Evidence |
|---|---|
| answer any questions regarding his current net worth, assets or accounts. | |

## III.  **CONCLUSIONS OF LAW**

1.      Summary adjudication "upon all or any part of [a] claim" is appropriate where there is no genuine dispute as to any material fact regarding that portion of the claim.  FRCP 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

2.      The movant in a summary judgment motion bears the initial burden of identifying the evidence that demonstrates the absence of any material fact.  *See Celotex*, 477 U.S. at 323.

3.      Once the summary judgment movant has meet its burden, the non-moving party may not rest on conclusory allegations or bald assertions, *see Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989), but must come forward with significant probative evidence tending to support its claim that material, triable issue of fact remain.  *See Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

4.      The evidence set forth by the non-moving party must be sufficient, taking the record as a whole, to allow a rational jury to find for the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Consequently, "[t]he mere scintilla of evidence in support of the [nonmoving party's] position will be insufficient."  *Liberty Lobby*, 477 U.S. at 252.

5.      The Court may draw adverse inferences from a civil defendant's invocation of the privilege against self-incrimination.  *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *SEC v. Colello*, 139 F.3d 674, 677-78 (9th Cir. 1998).

6.      "Parties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from their failure of proof."  *Colello*,

139 F.3d at 677.

7.      Section 17(a)(1) of the Securities Act of 1933 ("Securities Act") prohibits any person, in the offer or sale of any securities, from employing any device, scheme, or artifice to defraud; Section 17(a)(2) prohibits any person from obtaining money or property by means of an untrue material statement; and Section 17(a)(3) of the Securities Act prohibits any person, in the offer or sale of any securities, from engaging in any transaction, practice, or course of business which operates, or would operate, as a fraud or deceit upon the purchaser.  15 U.S.C. § 77q(a)

8.      Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5(a), (b), and (c) thereunder make it unlawful for any person in connection with the purchase or sale of securities to employ any device, scheme or artifice to defraud; to make any material misstatements or omissions; or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.  *See* 15 U.S.C. § 77q(a), 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5; *SEC v. Dain Rauscher, Inc*., 254 F.3d 852, 855 (9th Cir. 2001).

9.      Section 2(a)(1) of the Securities Act of and Section 3(a)(10) of the Exchange Act of 1934 define a "security" to include, among other things, "any note, … bond, [or] debenture."  15 U.S.C. §§ 77b(a)(1) and 78c(a)(10).

10.     Under *Reves v. Ernst & Young,* 494 U.S. 56 (1990), every note is presumed to be a security unless it bears a strong resemblance to a judicially-created list of non-security instruments.

11.     In *SEC v. W. J. Howey Co*., 328 U.S. 293, 298-99 (1946), the Supreme Court defined an investment contract to require:  (1) the investment of money; (2) in a common enterprise; (3) with an expectation of profits to be derived solely from the efforts of the promoter.

12.     The phrase "in connection with the purchase or sale" of a security is met when the fraud alleged "coincides with a securities transaction" (*see Merrill Lynch,*

*Pierce, Fenner & Smith Inc., v. Dabit*, 547 U.S. 71, 85 (2006)), while the term "in connection with" requires only that there be "deceptive practices touching" the purchase or sale of securities. *See Superintendent of Ins. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12-13 (1971); *see also SEC v. Zandford*, 535 U.S. 813, 819 (2002).

13.  Telephones, email and the internet are instrumentalities of interstate commerce. *See, e.g., United States v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008).

14.  Violations of Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder require scienter, while violations of Section 17(a)(2) and (a)(3) of the Securities Act require only a showing of negligence. *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980); *SEC v. Phan*, 500 F.3d 895, 907-08 (9th Cir. 2007); *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001).

15.  In the Ninth Circuit, scienter may be established by a showing of recklessness, defined as "highly unreasonable" conduct "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it…. [T]he danger of misleading buyers must be actually known or so obvious that any reasonable man would be legally bound as knowing." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569-70 (9th Cir. 1990) (en banc).

16.  The Ninth Circuit further clarified the "recklessness" standard in *SEC v. Platforms Wireless Int'l Corp.* where it held that scienter requires either "deliberate recklessness" or "conscious recklessness" – a "form of intent rather than a greater degree of negligence." 617 F.3d 1072, 1093 (9th Cir. 2010).

17.  Recklessness may be inferred from circumstantial evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 390, 391 n. 30 (1983); *SEC v. Burns*, 816 F.2d 471, 474 (9th Cir. 1987).

18.  Negligence is the absence of "reasonable prudence." *Dain Rauscher,*

*Inc.*, 254 F.3d at 856-57; *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453–54 (3d Cir.1997) (defining negligence in the securities context as the failure to exercise reasonable care or competence).

19.    Since a corporation acts through its officers, the culpability of an entity's principals is imputed to the corporation. *See, e.g., SEC v. Platforms Wireless Intern. Corp.*, 559 F. Supp. 2d 1091, 1096 (S.D. Cal. 2008), *aff'd.*, 617 F.3d 1072 (9th Cir. 2010), citing *SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1089 n.3 (2d Cir. 1972).

20.    The Ninth Circuit has adopted the "principal purpose and effect" test to determine whether an individual is primarily liable for scheme liability under the federal securities laws. *See Middlesex Retirement Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1191 (C.D. Cal. 2007); *see also SEC v. Fraser*, 2009 WL 2450508 at *10 (D. Ariz. Aug. 11, 2009) (unreported decision) (quoting *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds*, 519 F.3d 1041 (9th Cir. 2008)).

21.    Under the "principal purpose and effect" test, an actor will be liable for a scheme to defraud if he or she participated in an activity with the "principal purpose and effect of creating a false appearance of fact in furtherance of the scheme," in connection with the purchase or sale of securities. *Simpson,* 452 F.3d at 1050*; see also In re Parmalat Sec. Litig.,* 376 F. Supp. 2d 472 (S.D.N.Y. 2005).

22.    An individual may be liable for a scheme to defraud if he or she "committed a manipulative or deceptive act in furtherance of a scheme." *Simpson,* 452 F.3d at 1048 (quoting *Cooper v. Pickett,* 137 F.3d 616 (9th Cir. 1997). A deceptive act is one that "create[s] the false appearance of fact." *Id.*

23.    Ponzi payments are made "for the purpose of creating the appearance of a profitable business venture," which appearance is used to prevent withdrawals by early investors and to raise money from new investors. *Donell v. Kowell,* 533 F.3d 762, 777 (9th Cir. 2008).

24.    A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision.  *See TSC Indus., Inc.*, 426 U.S. at 449; *SEC v. Platforms Wireless*, 617 F.2d at 1092.

25.    Anyone who "makes" a misleading statement or omission, or who has "ultimate authority over" it, can be liable under Rule 10b-5.  *See Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011).

26.    Under Section 20(a) of the Exchange Act, a person may be held liable for another person's violation of the Exchange Act as a "control person."  15 U.S.C. § 78t(a).

27.    Control person liability requires:  (1) a violation of the Exchange Act, and (2) that the control person directly or indirectly controlled the primary violator.  *SEC v. Todd*, 642 F.3d 1207, 1223-1224 (9th Cir. 2011); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990) (*en banc*) (holding it unnecessary to show "culpable participation" by control person).

28.    Under Rule 12b-2 of the Exchange Act, control is defined as the "power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § Sections 5(a) and 5(c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate commerce, unless an exemption from registration applies.  *See SEC v. Eurobond Exch.*, 13 F.3d 1334, 1338 (9th Cir. 1994).

29.    Section 5 operates as a strict liability statute.  *See SEC v. Holschuh*, 694 F.2d 130, 137 n.10 (9th Cir. 1982) ("good faith is not relevant to whether there has been a primary violation of the registration requirements").

30.    Defendants bear the burden of establishing any claimed exemption.  *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); *SEC v. Murphy*, 626 F.2d at 633, 641(9th Cir. 1980).

31.    A civil defendant who asserts the Fifth Amendment privilege to all substantive questions should be precluded from offering any testimony to rebut the

57

SEC's proof of his liability.  *See Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 911-12 (9th Cir. 2008); *SEC v. Benson*, 657 F.Supp. 1122, 1129 (S.D.N.Y. 1987); *SEC v. Global Express Capital Real Estate Inv. Fund I, LLC*, No. 2:03-CV-01514-KJD-LRL, 2006 WL 7347289, *14 (D. Nev. March 28, 2006), *rev'd in part, aff'd in part*, 289 Fed. Appx. 183 (9th Cir. 2008).

32.    "[I]t would be an abuse of the Fifth Amendment to allow a civil litigant to use it to offer proofs while denying the adversary discovery of his contentions." *Benson*, 657 F.Supp. at 1129.

33.    While a civil defendant obviously has the right to assert the privilege, he "cannot have it both ways.  By hiding behind the protection of the Fifth Amendment as to his contentions, he gives up his right to prove them."  *Id.*; *see also Nationwide Life Ins.*, 541 F.3d at 910-11.

34.    It is well-established that "in civil proceedings, adverse inferences can be drawn from a party's invocation of [the] Fifth Amendment right" not to testify. *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000).

35.     "Parties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from their failure of proof."  *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998)

36.    For the inference to be drawn, the SEC must establish:

> The Court does not draw the inference unless (1) the SEC has a substantial need for the information, (2) no other, less burdensome means of obtaining the information exists, (3) "the value of presenting [the] evidence" is not "substantially outweighed by the danger of unfair prejudice to the party asserting the privilege," and (4) independent evidence of the fact about which the party refuses to testify exists.

*SEC v. Luna*, No. 2:10-CV-2166-PMP-CWH, 2014 WL 794202, at *12 (D. Nev. Feb. 26, 2014) (quoting *Nationwide*, 541 F.3d at 911-12); *see also Glanzer*, 232 F.3d at 1264; *see also Global Express Capital Real Estate*, 2006 WL 7347289, at *15

(finding adverse inference against defendants for asserting Fifth Amendment).

37. Section 20(b) of the Securities Act, and Section 21(d) of the Exchange Act, provide that upon proper showing, a permanent injunction shall be granted in enforcement actions brought by the SEC. 15 U.S.C. §§ 77t(b) and 78u(d),

38. That burden is met when the evidence establishes a reasonable likelihood of a future violation of the securities laws. *SEC v. Murphy*, 626 F.2d at 633; *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692 (9th Cir. 1978); *SEC v. Fehn*, 97 F.3d 1276, 1295-96 (9th Cir. 1996).

39. The SEC may seek, and courts may order, disgorgement of ill-gotten gains. *See SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998); *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995).

40. Courts have "broad equity powers to order the disgorgement of 'ill-gotten gains' obtained through the violation of the securities laws." *SEC v. First Pac. Bancorp*, 142 F.3d at 1191; *see also SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1113 (9th Cir. 2006).

41. Disgorgement usually includes prejudgment interest. Courts order prejudgment interest to ensure that the wrongdoer does not profit from the illegal activity. *See SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972); *SEC v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1190 (D. Nev. 2006).

42. Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act provide that the SEC may seek monetary civil penalties for violations of those Acts. 15 U.S.C. §§ 77t(d), § 78u(d)(3).

43. The Securities Act and the Exchange Act provide that penalties be assessed according to a three-tier system. 15 U.S.C. §§ 77t(d), § 78u(d)(3); *SEC v. CMKM Diamonds*, 635 F. Supp. 2d at 1191.

44. The three tiers of penalty amounts under Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act correspond to specified degrees of culpability. See 15 U.S.C. §§ 77t(d) & 78u(d)(3).

45.     Sections 20(e) and (g) of the Securities Act and Sections 21(d)(2) and (d)(5) of the Exchange Act authorize the SEC to seek bars against serving as a public company officer or director and against participating in any penny stock offering, against defendants who violate the antifraud provisions.  15 U.S.C. § 77t(e), (g); 15 U.S.C. § 78u(d)(2), (5)

Dated:  August 13, 2018                    Respectfully submitted,


                                           */s/ Amy Jane Longo*
                                           Amy Jane Longo
                                           Donald W. Searles
                                           Roberto A. Tercero
                                           Attorneys for Plaintiff
                                           Securities and Exchange Commission

## **PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
444 S. Flower Street, Suite 900, Los Angeles, California 90071
Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On August 13, 2018, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT KENNETH TELFORD** on all the parties to this action addressed as stated on the attached service list:

☐   **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐   **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐   **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐   **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐   **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☒   **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☐   **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐   **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  August 13, 2018                    _/s/ Amy Jane Longo_
                                          Amy Jane Longo

*SEC v. Jason McDiarmid, et al.*
**United States District Court—Central District of California**
**Case No. 2:17-CV-07201-SVW-FFM**

## <u>SERVICE LIST</u>

Kenneth Telford
kgc.telford@gmail.com
(by email only)